**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
:
In re:                                              : Chapter 11
:
      RUPARI HOLDING CORP., et al.,[1]       : Case No. 17-10793 (KJC)
:
           Debtors.                      : (Jointly Administered)
:
: **Hearing Date: May 24, 2017 @ 1:30 p.m. EDT**
: **Obj. Deadline: May 19 , 2017 @ 4:00 p.m. EDT**
---------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER APPROVING DEBTORS' KEY EMPLOYEE
INCENTIVE AND KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors (collectively, the "Debtors"), by and through their undersigned proposed counsel, DLA Piper LLP (US), hereby move the Court for the entry of an order pursuant to sections 105(a), 363(b), and 503(c) of title 11 of the United States Code (as amended, the "Bankruptcy Code"): (i) authorizing the Debtors to implement a performance-based key employee incentive plan, attached hereto as Exhibit A (the "KEIP"); for five (5) key executives (the "KEIP Participants"), (ii) authorizing the Debtors to implement a key employee retention plan, attached hereto as Exhibit B (the "KERP") for nine (9) non-executive key employees (the "KERP Participants" and collectively with the KEIP Participants, the "Participants"), (iii) granting administrative expense priority status to all payments made by the Debtors pursuant to the KEIP and KERP, and (iv) granting such other relief as the Court deems just and proper (the "Motion").  In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Rupari Holding Corp. (4943) and Rupari Food Services, Inc. (7933).  The mailing address for the Debtors is 15600 Wentworth Avenue, South Holland, Illinois 60473.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Debtors, their estates, and this matter under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.   This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

4.      On April 10, 2017 (the "Petition Date"), each Debtor filed a voluntary petition for relief under the Bankruptcy Code with this Court.

5.      The Debtors continue in possession of their properties and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.

6.      Debtor, Rupari Food Services, Inc. ("Rupari Food" or the "Company"), is a leading culinary supplier of uncooked and ready-to-eat sauced and unsauced ribs, barbeque ("BBQ") pork, and BBQ chicken.   Since 1978, Rupari Food has been producing and distributing the finest, restaurant-quality, pre-cooked, sauced, bone-in proteins, and related barbeque products.   With a focus primarily on the manufacture and sale of pork ribs, the Company operates four core businesses: (a) prepackaged retail; (b) food service; (c) deli; and (d) private label. The Company offers a full line of meats under the Rupari brand name, as well as a variety of products under the retail names of Tony Roma's® and Butcher's Prime®.   The Company's

products are available fresh, frozen, and in the hot and cold deli sections at large and mid-sized retailers throughout the United States and Canada.

7.    A variety of both external and operational challenges resulted in a decline in historical performance, including a rise in the price of pork due to the Chinese pork epidemic and the livestock virus that affected pork in the United States in 2014 and 2015.    These macroeconomic and natural forces caused the Company to experience liquidity issues, which exacerbated the Debtors' capital structure and debt load.

8.    These issues led the Debtors and their financial and legal advisors to explore actions to address the rapid changes in the competitive economic environment and to manage their prepetition liabilities.  Commencing in mid-2016, Rupari Food began exploring potential sales of substantially all of its business assets.  But, it became clear that the sale process could not be completed in sufficient time to offset the continued deterioration in the Debtors' liquidity or at a value that would permit the Debtors to address in full their debt maturities and liquidity needs.

9.    After carefully exploring and exhausting almost all possibilities, the Debtors have determined, in their business judgment, that commencement of these chapter 11 cases and undertaking a sale of substantially all of the Debtors' assets represents the best available alternative for the Debtors to meet their immediate and ongoing liquidity needs, while continuing to operate in the ordinary course of business during this process for the benefit of the Debtors' customers, employees, vendors, and other stakeholders.

10.    In doing so, and after careful evaluation, it was determined that the filing of these chapter 11 cases would provide the Debtors with the oversight and respite to operate their

businesses and ensure the highest possible recovery to creditors, while protecting jobs and minimizing the impact to the substantial majority of the Debtors' vendors and customers.

11.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in the *Declaration of Jack Kelly in Support of First Day Pleadings* [D.I. 19].

12.     On April 11, 2017, the Debtors filed the *Motion of Debtors for Entry of Orders (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II)(A) Approving and Authorizing Sale of Substantially All Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 27] (the "Bidding Procedures Motion").   The Court approved the Bidding Procedures Motion on April 24, 2017, which reflected a substantially approved transaction over that filed on the Petition Date.

## RELIEF REQUESTED

13.     By this Motion, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as Exhibit C, pursuant to sections 105(a), 363(b), and 503 of the Bankruptcy Code, authorizing the Debtors to adopt and implement the KEIP and the KERP, and granting administrative expense priority status to all payments made by the Debtors thereunder.

14.     The filing of a bankruptcy case necessarily creates difficulties for a company and its employees and can lead to retention problems, low morale, and low productivity. Unfortunately, these negative consequences can affect a debtor's ability to maximize the value of their assets to achieve the highest possible recovery for their creditors and stakeholders.  For this reason, bankruptcy courts have long authorized thoughtful incentive and retention plans designed to reduce disruption to employees while improving morale and incentivizing job performance. Courts have routinely approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as an exercise of the debtors' business judgement.

15.     These issues have become prevalent with the Debtors' operations both prior to, and in the wake of the chapter 11 filing.  The Debtors submit that approval of the performance-based KEIP and the KERP fully aligns the interests of the Participants with the interests of the Debtors' constituencies in maximizing the returns on a Sale Transaction while simultaneously maintaining the Debtors' operations during this critical time and throughout the pendency of these Chapter 11 cases.  The Debtors need to maintain the loyalty of the KERP Participants and the KEIP Participants, all of whom are highly skilled and have institutional knowledge, to deliver their best performance throughout the restructuring process for the benefit of the Debtors' creditors and stakeholders.

*Description of the KEIP for Certain Critical Executive Employees*

16.     A summary of the KEIP is as follows:[2]

| | |
|---|---|
| **KEIP Participants** | 1. Jack Kelly (Chief Executive Officer)<br>2. Micah Valine (Chief Financial Officer)<br>3. Michael Kaczynski (Chief Sales Officer)<br>4. Matthew Jackson (VP Supply Chain)<br>5. Kristin Kroepfl (VP Marketing) |
| **Eligibility** | For a KEIP Participant to receive any KEIP payments set forth in the KEIP, they must be an employee of the Company as of the consummation of the Sale Transaction (defined below). If the KEIP Participant is terminated without cause within thirty (30) days prior to the date that any payment is due under the KEIP, the KEIP Participant shall be entitled to receive any payment that would have become due under the KEIP had the KEIP Participant been employed through such thirty (30) day period.<br><br>If a KEIP Participant is entitled to receive any KEIP payment described below, the Company shall also pay such KEIP Participant's premiums required to continue the group health insurance coverage for such KEIP Participant and his/her dependents under the Consolidated Omnibus Reconciliation Act of 1985 for a period of six months, or if the Company's group health insurance coverage is terminated, KEIP Participants are eligible to receive an equivalent coverage purchased on the individual market for a period of six (6) months. |
| **Release** | Each KEIP Participant must execute (without revocation within any statutorily-authorized revocation period) a general release of known and unknown claims in favor of the Company and its affiliated persons and entities in a form satisfactory to the Company. |
| **Payment** | Within five (5) business days following the consummation of a Sale Transaction, as applicable. |
| **Sale Transaction** | A Sale Transaction means any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation, or other entity, and also including, among others, any of the existing owners or shareholders (in each such case only to the extent there is an additional bona fide third-party offer), employees, or creditors of the Company and/or the affiliates of each) in one or a series of related transactions of (a) substantially all equity interests held and/or (b) all or substantially all of the assets or operations the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options, or assets with or without a purchase option, a merger, consolidation, or other business combination, an exchange or tender offer, or any similar transaction, including, without limitation, any sale |

---

[2]     In the event of a discrepancy between the summary and the KEIP, the KEIP shall control. Capitalized terms not otherwise defined in this summary shall have the meanings ascribed to such terms in the KEIP.

| | transaction under sections 363, 1129, or any other provision of the Bankruptcy Code. |
|---|---|
| **Company Sale Transaction at the Base Value** | Upon a Sale Transaction, that provides for the receipt of the Total Consideration (defined below) by the Company of $23.5 million in cash plus amounts paid for the Company's plant and equipment either in cash or through the assumption or cancellation of capital leases (current book value of $17.4 million) (such aggregate amount, the "Base Value"), the KEIP Participants shall receive the following:<br><br>• Jack Kelly- $325,000<br>• Micah Valine- $275,000<br>• Matthew Jackson- $200,000<br>• Michael Kaczynski - $160,000<br>• Kristin Kroepfl - $145,000<br><br>Such amounts are referred to as the "Threshold Amount."<br><br>"Total Consideration" means, (i) in the case of the sale, exchange or purchase of the Company's equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities), plus the principal amount of all indebtedness for borrowed money (including, without limitation, any capital lease obligations) which remains outstanding as of the consummation of such sale, exchange or purchase, and (ii) in the case of a sale, disposition or licensing by the Company of assets, the total consideration paid for such assets, plus the principal amount of all indebtedness assumed by the purchaser. |
| **Company Sale Transaction in excess of Base Value** | For a sale of all or substantially all of the assets of the Company that provides for the receipt of Total Consideration by the Company in excess of $40,900,000, the following amounts will be made available to the KEIP Participants accordingly:<br><br>• Jack Kelly - 40%<br>• Micah Valine - 15%<br>• Michael Kaczynski - 15%<br>• Matthew Jackson - 15%<br>• Kristin Kroepfl – 15%<br><br>These percentages will be implemented based on the following scale:<br>• Total Consideration from Base Value to Base Value +$5,500,000 – The Threshold Amount, plus 1.5% of the Total Consideration from Base Value to Base Value + $5,500,000, plus;<br>• Total Consideration from Base Value + $5,500,001 to Base Value plus $8,500,000 – 2.25% of the Total Considerations from Base Value + $5,500,001 to Base Value + $8,500,000, plus;<br>• Total Consideration from Base Value + $8,500,001 to Base Value + $11,500,000 – 3% of Total Consideration, from Base Value + $8,500,001 to Base Value + $11,500,000; and |

| | |
|---|---|
| | • Total Consideration in excess of Base Value + $11,500,000 – 4.0% of Total Consideration in excess of Base Value + $11,500,000.<br><br>The total amounts that will be made available to the KEIP Participants upon the consummation of the sale of the Company shall not exceed $1,400,000. |

### Description of the KERP for Certain Critical Non-Executive Employees

17.    A summary of the KERP is as follows:[3]

| | |
|---|---|
| **Eligibility** | All employees referenced herein shall be considered "Non-Executive KERP Participants." For a KERP Participant to receive any payments set forth in the Non-Executive KERP, they must be an employee of the Company as of the timing of the payments as set forth herein. Notwithstanding anything to the contrary herein, if the Non-Executive KERP Participant is terminated without cause within thirty (30) days prior to the date that any payment is due under the Non-Executive KERP, the Non-Executive KERP Participant shall be entitled to receive any payment that would have become due under the Non-Executive KERP had the Non-Executive KERP Participant been employed through such thirty (30) day period.<br><br>In the event that a Non-Executive KERP Participant is entitled to receive any payment described herein but such a Non-Executive KERP Participant is no longer employed by the Company on the date that a payment is due under the Non-Executive KERP, the amount attributable to that Non-Executive KERP Participant shall, at the discretion of the Special Committee of the Board of Directors, either be distributed to other key employees or retained by the Company.<br><br>In addition, in the event that a Non-Executive KERP Participant is entitled to receive any payment described below and no longer is employed by the Company, the Company shall also pay the premiums (both Company's and Non-Executive KERP Participant's portions thereof) required to continue the group health insurance coverage for such Non-Executive KERP Participant and his or her dependents under the Consolidated Omnibus Reconciliation Act of 1985 for a period of twelve (12) months following the Non-Executive KERP Participant's end of employment with the Company, at the same participation level such Non-Executive KERP Participant was enrolled prior to the end of such Non-Executive KERP Participant's employment.<br><br>"Cause" shall be defined as the occurrence of: (a) gross neglect, gross malfeasance, or gross insubordination in performing the Non-Executive KERP Participant's duties; (b) the Non-Executive KERP Participant's conviction of a felony, excluding convictions associated with traffic violations; (c) an egregious act of dishonesty (including, without limitation, theft or embezzlement) or a malicious action by the Non-Executive KERP Participant toward the Company's |

---

[3]    In the event of a discrepancy between the summary and the KERP, the KERP shall control. Capitalized terms not otherwise defined in this summary shall have the meanings ascribed to such terms in the KERP.

| | |
|---|---|
| | customers or employees that is materially detrimental to the business or reputation of the Company; or (d) intentional reckless conduct that is materially detrimental to the business or reputation of the Company (provided that any occurrence of cause shall be deemed to constitute cause only after a good faith finding by the Board of Directors of the Company, or a duly constituted committee thereof, and the failure to remedy such cause to the board's or the committee's reasonable satisfaction within thirty (30) days after delivery of a written notice to the Non-Executive KERP Participant of such finding). |
| **Release** | Each KERP Participant must execute (without revocation within any statutorily authorized revocation period) a general release of known and unknown claims in favor of the Company and its affiliated persons and entities in a form satisfactory to the Company. |
| **KERP Bonus Amount and Payment** | The Company shall pay to each Participant a bonus amount (the "<u>KERP Bonus Amount</u>") in a cash lump sum equal to 35% of each KERP Participant's base salary. The KERP Bonus Amount shall be payable as follows: (i) one-third of the KERP Bonus Amount following the date that is forty-five (45) days following the filing of voluntary petitions under chapter 11 of the Bankruptcy Code; and (ii) two-thirds of the KERP Bonus Amount upon the consummation of a Sale Transaction. |
| **Sale Transaction** | A Sale Transaction means any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation, or other entity, and also including, among others, any of the existing owners or shareholders (in each such case only to the extent there is an additional bona fide third-party offer), employees, or creditors of the Company and/or the affiliates of each) in one or a series of related transactions of (a) substantially all equity interests held and/or (b) all or substantially all of the assets or operations the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options, or assets with or without a purchase option, a merger, consolidation, or other business combination, an exchange or tender offer, or any similar transaction, including, without limitation, any sale transaction under sections 363, 1129, or any other provision of the Bankruptcy Code. |
| **Discretionary Pool** | The Company shall establish a pool of $50,000 solely for the purposes of providing incentive compensation to the Company's non-executive employees, other than the KERP Participants, during the Company's restructuring efforts. Of these amounts, no more than $10,500 may be awarded to any single employee. The determination to provide such compensation shall be made by the Chief Executive Officer, or such other person(s) as he may delegate, in his/their sole discretion. |

## APPLICABLE AUTHORITY

**A.**     **The KERP Applies Only to Non-Insiders and Is Not Prohibited By Section 503(c)(1) or (2).**

18.     The KERP provides retention payments to non-insider employees and is therefore not subject to the requirements of section 503(c)(1) or (2) of the Bankruptcy Code, which apply only to insiders.  Section 101(31)(B) of the Bankruptcy Code defines an insider as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor.  *See* 11 U.S.C. § 101(31)(B).  None of the KERP Participants meet this definition.

19.     The Court previously held that any person holding an officer's title is presumptively an officer and thus an insider.  *In re Foothills Texas, Inc.*, 408 B.R. 573 (Bankr. D. Del. 2009).  In *Foothills Texas* the Court held that "a party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e.*, he or she is not taking part in the management of the debtor." *Id*. at 574-75.

20.     None of the KERP Participants report to the Board of Directors or the Chief Executive Officer.  All of the KERP Participants report to intermediate managers.  *See In re Global Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board).  All of the KERP Participants' duties are limited support functions and all are restricted to a particular division. Courts have declined to find insider status where the scope of authority is quite limited.  *See In re Borders Group., Inc.*, 453 B.R. 459, 468-69 (Bankr. S.D.N.Y. 2011) (stating that "[a]n individual's title, by itself, is insufficient to establish that an individual is a director or officer"

and holding employees in KERP plan were not insiders because none of them had authority to implement company policy, did not report to board of directors and were subordinate to actual officers). The titles these KERP Participants have been given reflect the employees' individual functions and roles, but do not reflect an officer's or director's status. *See In re NMI Sys., Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions.").

21.     Some of the KERP Participants hold the title of Director as part of their title but do not hold the role of a corporate director, rather they are afforded the title as director as to their respective role in a particular division. In addition, none of the KERP Participants hold the title of Vice President or another title which may suggest management control, and none of the KERP Participants take part in the overall management of the Debtors, direct or implement company policy or report to the Board of Directors. The KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but will not be individuals who manage or control the Debtors' businesses. Therefore, they are not "insiders" and, accordingly, the prohibitions and restrictions in section 503(c)(1) and (2) do not apply here, as those provisions restrict the ability of "insiders" to receive payments as part of retention or severance plans.[4]

22.     The KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these chapter 11 cases due to perceived uncertainty and concern over their job prospects. Indeed, the filing of these chapter 11 cases have a necessary

---

[4]     The Debtors are prepared to submit at the hearing on this Motion additional evidence necessary to rebut any presumption of insider status conferred by the KERP Participants' titles. Should the Court find that any presumption of insider status has not been overcome, the Debtors reserve the right to move any such KERP participant from the KERP and seek inclusion in the KEIP.

byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing the value of the Debtors' estates.  As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would engender.  Accordingly, it is critical to the Debtors' restructuring process that the Debtors retain the services of the KEIP Participants throughout the duration of these chapter 11 cases.

23.     Recently, courts have approved similar incentive plans that contemplate retention payments to non-insiders.  *In re Imaging US Liquidating Corporation (f/k/a Imris, Inc.)*, Case No. 15-11133-CSS (Bankr D. Del, June 16, 2015) (approving non-insider key employee retention program);  *In re Parallel Energy LP*, Case No. 15-12263-KG (Bankr. D. Del. Dec. 28, 2015) (approving non-insider key employee retention program);  *In re Taylor Wharton International LLC*, Case No. 15-12075-BLS (Bankr. D. Del. Nov. 23, 2015*); In re Prommis Holdings, LLC*, No. 13-10551 (BLS) (Bankr. D. Del. Apr. 11, 2013) (approving a retention plan for non-insiders).

24.     The KERP was designed by the Debtors' management team, in close collaboration with the Debtors' advisors and the Company's Special Committee (the "Special Committee"), to incentivize performance and ensure continued employment of certain non-insider employees who the Debtors have identified as critical to the Debtors' continued operation and successful organization, all within the parameters of sections 363(b) and 503(c) of the Bankruptcy Code.  The KERP Participants work across the Debtors' organizational structure—including, but not limited to, operations, finance, and production support—and are responsible for managing a variety of tasks and processes critical to the Debtors' day-to-day operations.  Many of the KERP Participants have worked with the Debtors for many years and have

extensive institutional knowledge such that their loss would cause significant disruption to the Debtors' operations and ability to implement a successful restructuring.

25.    For purposes of selecting the KERP Participants, the Debtors' executive team, with the assistance of their advisors, and the Special Committee, conducted a four step process to identify nine employees critical to the Debtors' organizational structure and necessary to carry out the day to day operations of the Debtors' business.  Once these employees were identified, the executive team further evaluated each employee on the basis of "business impact" and retention.  Specifically, the executive team considered: (a) whether an employee has unique or significant knowledge of the Debtors' infrastructure and business, (b) whether the employee's unique skills or experiences would be crucial to the Debtors' operations and reorganization, (c) the anticipated demand for the aforementioned knowledge and skill in the marketplace, and (d) the time, expense, and ease of finding an adequate replacement.  Next, based on their evaluation of these criteria, the executive team determined that each KERP Participant shall be eligible to receive the KERP Bonus Amount in a cash lump sum equal to 35% of each KERP Participant's base salary.

26.    The KERP Bonus Amount would be paid to each KERP Participant in two installments, one-third after 45 days following the Petition Date and two-thirds after the consummation of a Sale Transaction.  In order to meet the unanticipated needs that may arise during the pendency of these chapter 11 cases, the Debtors propose a $50,000 discretionary pool for the purposes of providing incentive compensation to the Company's non-executive employees during the Company's restructuring efforts.  Of these amounts, no more than $10,500 will be awarded to any single employee.

27.     In order to verify the reasonableness of the KERP, the Debtors, their advisors, and the Special Committee undertook a review of approved non-insider retention plans in other recent chapter 11 cases.  The purpose of this review was to gather data with respect to the design and general construct of various non-insider retention in other chapter 11 cases and disclosed plan costs and opportunities (where available) expressed as a percent of base salary.  Based on this analysis of recently approved, non-insider retention plans, the Debtors observed, among other things, that the KERP is largely consistent with comparable plans.

28.     Based on the foregoing analysis, the Debtors' proposed KERP is reasonable compared to similar retention plans when considered under the facts and circumstances of these chapter 11 cases.

**B.     The KEIP is an Incentive Plan That Does Not Run Afoul of Section 503(c) of the Bankruptcy Code.**

29.     Section 503(c) of the Bankruptcy Code imposes certain restrictions on the compensation that a debtor can pay to its executives and other employees in bankruptcy.  Section 503(c)(1) applies to payments that are meant to induce insiders to "remain with the [debtor's] business" by requiring, among other things, that a debtor demonstrate that the insider (a) has a bona fide job offer from another business and (b) is "essential to the survival of the business." 11 U.S.C. §503(c)(1)(A) and (B).  Section 503(c)(1) also limits the amount of retention payments that can be made to "insiders."  *See id*.  Likewise, section 503(c)(2) permits severance payments to "insiders" only if they are part of a program applicable to all employees and are less than ten times the mean of severance payments made to non-management employees during that calendar year.  11 U.S.C. § 503(c)(2).  These sections, however, are limited in their application to "insiders" and neither applies to plans primarily implemented to incentivize personnel or that are not in the nature of a severance.  *See In re Global Home Products, LLC*, 369 B.R. 778, 785

14

(Bankr. D. Del. 2007) ("BAPCA requires the Court to apply specific standards if bankruptcy court is asked to authorize payments to insiders for the purpose of inducing insiders to remain in a debtor's employ, or payments made on account of severance . . . [t]he entire analysis changes if a bonus plan is not primarily motivated to retain personnel or is not in the nature of severance").

30. The KEIP is an incentive program with relevant and important performance targets that were, when established, and currently are, a challenge to meet, and are fashioned to maximize the value of the Debtors' estates. Specifically, when the KEIP was implemented, the Debtors' operations, business, and restructuring plan were very much uncertain. Only through the efforts and dedication of the Debtors and their management team, through weeks of extensive, wide-ranging, and often contentious negotiations with the prepetition secured lender (and their advisors), vendors, and other stakeholders, as well as negotiations with several potential stalking-horse purchasers, were the Debtors able to achieve the soft landing in chapter 11. Therefore, the KEIP is not simply a retention plan, meant to ensure continued employment for insiders, nor is it a severance plan. To the contrary, the KEIP is a thoughtfully designed program for a select group of key executives that incentivizes them to achieve a successful Sale Transaction and is amply justified by the facts and circumstances of these chapter 11 cases. The Debtors worked diligently in identifying the appropriate personnel to participate in the KEIP. The KEIP Participants were selected because of their unique operational and historical knowledge of the company which will enable them to best operate the Debtors' business and to obtain the highest possible value for the Debtors' assets.

31. The KEIP proposes a bonus structure that incentivizes the KEIP Participants to obtain the highest and best terms for any proposed transaction. The Debtors submit that, rather

than being prohibited under section 503(c)(1) or (2), the KEIP is permitted under section 503(c)(3).

32.     Although some of the KEIP Participants may be deemed "insiders" within the meaning of the Bankruptcy Code, the KEIP has been crafted with great care to ensure that it directly incentivizes all KEIP Participants to meet certain performance objectives.  Even if the KEIP has the indirect effect of reducing the Debtors' attrition rate among the KEIP Participants, such reduction in attrition does not convert the KEIP into a retention-driven plan.  *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "[t]he fact that . . . all compensation has a retention element does not reduce the Court's conviction that the Debtors' primary goal in approving the incentive plans was "to create value by motivating performance").  A plan that indirectly causes its participants to remain employed does not detract from the KEIP's primary purpose, which is to motivate the KEIP Participants to maximize value to the Debtors' estates.

33.     The Debtors' proposed KEIP is designed to provide an incentive to the KEIP Participants to assist the Debtors in achieving their goal of maximizing the value of their estates. The KEIP is not primarily designed to retain the KEIP Participants and, accordingly, the Debtors believe that section 503(c)(3) of the Bankruptcy Code is the applicable section for this Court to evaluate the requested relief.

34.     Section 503(c)(3) of the Bankruptcy Code limits the payment of obligations outside of the ordinary course of business that are not covered by sections 503(c)(1) or (2). Specifically, section 503(c)(3) provides as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations
> that are outside the ordinary course of business and not justified by the

> facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

35.     The Court has approved similar plans tied to performance targets.  *See, e.g., In re Longview Power, LLC,* Case No. 13-12211 (BLS) (Bankr. D. Del. Dec. 18, 2013) (approving incentive payments to senior executives based upon the achievement of certain goals driven by the debtors' chapter 11 timeline and the desire to limit the costs of the cases); *In re Trident Microsystems, Inc.*, Case No. 12-10069 (CSS) (Bankr. D. Del. July 10, 2012) (approving incentive payments to senior managers based on distributions to creditors); *In re Midway Games Inc.*, Case No. 09-10465 (KG) (Bankr. D. Del. Apr. 23, 2009) (approving an incentive plan for insiders based on the achievement of chapter 11 restructuring milestones).

36.     The ruling in *Global Home Products* is particularly instructive.  There, the court provided detailed analysis as to whether a debtor's proposed employee incentive plan met the business judgment standard.  The court balanced different factors to determine whether the incentive plan was permitted under section 503(c), including:

> (a) whether the plan is calculated to achieve the desired performance;
>
> (b) whether the costs of the plan are reasonable within the context of the debtor's assets;
>
> (c) whether the scope of the plan is fair and reasonable;
>
> (d) whether the plan is consistent with industry standards;
>
> (e) whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what type of plans are generally available in a particular industry; and
>
> (f) whether the debtor received independent counsel in performing due diligence and creating and authorizing incentive compensation.

*See*, *e.g.*, *In re Global Home Prods.*, 369 B.R. at 786 (citing *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006)).

37.    The incentive plan requested here is a reasonable exercise of the Debtors' sound business judgment because it was carefully designed with assistance from their advisors and the Special Committee, and seeks to incentivize key employee performance to achieve a Sale Transaction, which is the Debtors' highest priorities during these chapter 11 cases.

38.    The factors set forth in *Global Home Products* weigh in favor of approving the KEIP.  First, the KEIP is calculated to achieve desired performance and maximize recovery to the Debtors' estates.  Payments under the KEIP are directly linked to the Debtors' business performance.  The assistance of the KEIP Participants has been, and indeed will be, critical to the Debtors' ability to drive an expeditious chapter 11 sale process and maximize value for the Debtors' estates.  Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the traditional terms of their employment, but they have been, and will continue to be, required to expend significant additional time and resources on tasks relating to the Debtors' sale process.  The Debtors and their advisors designed and refined the KEIP to properly motivate and appropriately reward KEIP Participants for their significant efforts and the increased demands placed upon them in connection with these chapter 11 cases.[5]

39.    The Debtors' Credit Facility (the "Credit Facility") and the Asset Purchase Agreement by and among Carl Buddig & Co. as Purchaser, Rupari Holding Corp. as Seller, dated as of April 11, 2017 (the "Stalking Horse APA") contain numerous milestones, covenants and other restrictions that require intense focus and dedication from the KEIP Participants in order to complete and obtain approval of a Sale Transaction on a very tight timeline.  These

---

[5] It is important to note that at present, already one KEIP Participant has received a binding employment offer from a competitor.

requirements underscore the need for the Debtors to have the assistance of their most critical employees during these chapter 11 cases.  In order to provide appropriate incentives, the Debtors, in consultation with their advisors, and the Special Committee more fully aligned the benchmarks contained in the KEIP with certain requirements and milestones, and also completed a thorough analysis of sale thresholds to adequately align management's efforts on maximizing the value of the Debtors' estates.

40.     Second, the incentive payments contemplated in the KEIP are fair and reasonable in amount because they significantly improve the estates' chances of recovering value and involve a small cost relative to the potential benefit to be realized by the Debtors upon the occurrence of goals set forth in the KEIP.  *See, e.g.*, Hr'g Tr., at 261:13-24, May 7, 2007, *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (Bankr. D. Del. 2007) ("[T]he total amount to be paid is about $3.3 million . . . . But this amount is a fraction of the total value to be achieved and preserved by this Estate, and it's a small fraction.  So it seems to me that in the Debtor's business judgment, if it spends this amount of money, it can preserve literally tens of millions of dollars, or potentially more, worth the value for the Estate, it seems to me to be a very small amount of money well spent.").

41.     The Debtors, their advisors, and the Special Committee also reviewed multiple incentive plans implemented by similar companies in chapter 11 and discussed in detail which employees would have the greatest impact on the sale process and should be incentivized.

42.     It is clear that the cost of the proposed KEIP is within the range of market practice as compared to the plans proposed and approved at similarly-situated companies.  Total payment to the KEIP Participants will not exceed $1,400,000 or a total pool of 4.0% of the "Total Consideration" of a Sale Transaction, which amount may increase based upon overall purchase

price.  In the aggregate, the proposed target cost is $1,105,000 for a Sale Transaction (based on a $40.9 million Sale Transaction value).

43.     The payments are fair and reasonable because they are directly tied to increased sale value that are the direct result of the KEIP Participants' performance.  Additionally, the KEIP is reasonable in scope because it only applies to a total of five executives and officers.  The Debtors rely heavily on the efforts of the KEIP Participants and their performance will have the greatest impact during the restructuring process and the ultimate value of the Debtors' estates.

44.     The Debtors discussed their options with their advisors and the Special Committee and arrived at the current structure of the KEIP only after lengthy discussions and several rounds of revisions.  The Debtors' consultation with their advisors and the Special Committee demonstrates a reasonable exercise of sound business judgment.  The Debtors consulted numerous times with their advisors, and the Special Committee, conducted due diligence on the Debtors' employee roster, reviewed benchmark and past compensation metrics, and made various refinements prior to obtaining final approval.  These efforts, combined with the Debtors' obtaining advice from their advisors and the Special Committee, constitute sufficient due diligence to meet the business judgment standard.

45.     In sum, the overall cost of the KEIP is reasonable, particularly in light of the additional work beyond the duties placed on employees in normal bankruptcy cases and the extraordinary speed at which the KEIP Participants are demanded to perform those additional duties.  Given the various complex issues in these chapter 11 cases, and the accelerated timeline under which the Debtors must consummate a Sale Transaction, it is critical to the Debtors' restructuring and the value of their estates that the KEIP Participants remain in the Debtors' employ.  Accordingly, the Debtors submit that the KEIP constitute a reasonable exercise of the

Debtors' sound business judgment and should be approved, as the KEIP is in the best interests of the Debtors' estates, their creditors, and other stakeholders.

46.    Based on the forgoing, the Debtors submit that the KEIP is justified by the facts and circumstances of these chapter 11 cases.

**C.    The KEIP and KERP Should Be Approved as a Reasonable Exercise of the Debtors' Business Judgment.**

47.    Because the KEIP and KERP are not prohibited by section 503(c)(1) or (2) of the Bankruptcy Code, the Court should issue an order authorizing the Debtors to implement the plans under section 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

48.    The standard for approving payments under section 503(c)(3) is essentially the same "business judgment" standard for approving similar transactions under section 363(b)(1) of the Bankruptcy Code. *See*, *e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 804 (Bankr. D. Del. 2007) (holding that, because bonus plan's primary motivation was not retentive, section 503(c)(1) did not apply and business judgment standard was to be used to assess plan); *In re Global Home Prods., LLC*, 369 B.R. at 787 (same).

49.    Section 363(b)(1) of the Bankruptcy Code allows a debtor in possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing, in the exercise of the Debtors' business judgment.  11 U.S.C. § 363(b)(1); *see also*, *e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that under normal circumstances, courts will defer to debtor's judgment in using property under section 363(b) if there is legitimate business justification).  Therefore, the estate's property may be used other than in the ordinary course of business if the debtor can show a "sound business purpose" for such use. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him [supports a] good

business reason to grant the application."). If a debtor shows a valid business purpose, the court applies the "business judgment rule," a presumption "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (internal citations omitted).

50.    The KEIP and KERP each represent a sound business purpose and satisfy the business judgment rule. The KEIP and KERP facilitate the Debtors' restructuring process by incentivizing crucial employees to ensure that the pursuit of any sale or restructuring is effective and that asset value is maximized. These goals cannot be met if skilled key employees depart prematurely or if executives are not appropriately incentivized. Payments under the KEIP directly incentivize key executives to achieve the highest cash flow and to efficiently restructure the Debtors' business. The KERP provides non-insider employees with security and a reward for remaining loyal to the Debtors during this critical period.

51.    Accordingly, for the foregoing reasons, the Debtors request the approval of the KEIP and KERP as such approval is in the best interest of the Debtors' estates, their creditors and all parties-in-interest.

**D.    The Payments Contemplated Under the KEIP and KERP Constitute Actual and Necessary Costs of Preserving the Debtors' Estates.**

52.    The payments contemplated under the KEIP and KERP constitute actual and necessary costs, and expenses of preserving, and potentially enhancing, the Debtors' estates. The KEIP is a performance based plan intended to motivate participants to achieve certain targeted financial results. The Debtors' ability to maximize recovery for the Debtors' estates and creditor constituencies is dependent on the Debtors' achievement of a Sale Transaction. Further, the KERP is intended to maintain maximum value of the Company while the Sale Transaction is

pending.   Accordingly, the payments contemplated thereunder constitute actual and necessary costs of the Debtors' estates under section 503(b) of the Bankruptcy Code.

**E.      The KEIP and KERP May Additionally Be Authorized Pursuant to Section 105(a) of the Bankruptcy Code.**

53.      Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(1).

54.      As stated, the KEIP and KERP are critical to their chapter 11 efforts.  Payments thereunder are essential to appropriately reward the Participants for all of their efforts prior to and throughout these bankruptcy cases, to maintain the morale and to ensure such Participants' continued focus during the bankruptcy cases to the enhancement of the enterprise value of the Debtors.  The Debtors submit that such payments are necessary to maximize value of their estates for the benefit of their constituencies.

55.      The Debtors respectfully submit that the post-petition compensation described herein for the Participants is an appropriate exercise of the Debtors' business judgment, is necessary, and in the best interest of the Debtors, their creditors, and their estates and should be approved under sections 105(a) and 363(b) of the Bankruptcy Code and allowed as administrative expenses under 503(b) of the Bankruptcy Code.

**F.      Waiver of the 14-Day Stay**

56.      Finally, the Debtors request a waiver of the 14-day stay that would otherwise apply to the Court's approval of the KEIP and KERP pursuant to Bankruptcy Rule 6004(h).  In order to implement the foregoing successfully, the Debtors must be able to provide certainty to the Participants that they will be compensated for their efforts to maximize value of the Debtors'

estates during this critical process.  Therefore, the Court should approve the waiver of the 14-day stay under Bankruptcy Rules 6004(h).

## NO PRIOR REQUEST

57.    No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

## NOTICE

58.    Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the Agent for the Prepetition Senior Secured Lenders; (d) counsel to the lenders under the Subordinated Credit Facility; and (e) any party requesting notice under Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order, substantially in the form attached hereto as Exhibit C granting the relief requested herein, and (ii) grant such other and further relief as the Court may deem proper.

Dated: May 2, 2017                   Respectfully submitted,
      Wilmington, Delaware

                                     **DLA PIPER LLP (US)**

                                     /s/ R. Craig Martin
                                     R. Craig Martin (DE 5032)
                                     Maris J. Kandestin (DE 5294)
                                     1201 North Market Street, Suite 2100
                                     Wilmington, Delaware 19801
                                     Telephone: (302) 468-5700
                                     Facsimile: (302) 394-2341
                                     Email: craig.martin@dlapiper.com
                                              maris.kandestin@dlapiper.com

                                     -and-

                                     Richard A. Chesley (*pro hac vice* admission)
                                     John K. Lyons (*pro hac vice* admission)
                                     444 West Lake Street, Suite 900
                                     Chicago, Illinois 60606
                                     Telephone:  (312) 368-4000
                                     Facsimile:   (312) 236-7516
                                     Email:  richard.chesley@dlapiper.com
                                              john.lyons@dlapiper.com

                                     *Proposed Counsel for Debtors and Debtors in Possession*