**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RUPARI HOLDINGS, INC., *et al.*, | Case No. 17-10793 (KJC) |
| Debtors. | Jointly Administered |

**MOTION OF ROMA DINING, LLC AND ROMACORP., INC. FOR AN
ORDER (I) FINDING THAT AS A MATTER OF LAW THE TRADEMARK
LICENSE AGREEMENT COULD NOT BE ASSUMED AND ASSIGNED,
EVEN IF IT HAD NOT BEEN TERMINATED, AND (II) IN AN ABUNDANCE OF
CAUTION, RETROACTIVELY MODIFYING THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362(d) IN THE EVENT THAT THE AUTOMATIC
STAY COULD BE HELD TO APPLY TO THE LICENSE AGREEMENT**

Roma Dining, LLC and Romacorp Inc. (together, "Roma"), by and through the

undersigned counsel, hereby submit this motion (the "Motion") for an order pursuant to sections

105(a) and 362(d) of Title 11 of the United States Code (the "Bankruptcy Code"), substantially

in the form attached hereto (I) finding that as a matter of law the License Agreement could not be

assumed and assigned, even if it had not been terminated, and (II) in an abundance of caution,

retroactively modifying the automatic stay pursuant to 11 U.S.C. § 362(d) in the event that the

automatic stay could be held to apply to the License Agreement.  In support of this Motion,

Roma states as follows:

## I.     PRELIMINARY STATEMENT

1.     Throughout these bankruptcy cases (the "Bankruptcy Cases"), the above-captioned

debtors (the "Debtors" or "Rupari") have pursued actions intended to interfere with Roma's

legitimate business interests.  After (i) dismissing an adversary proceeding filed on the petition

date (the "First Adversary Proceeding") seeking to challenge the valid pre-petition termination of

the trademark license agreement (the "License Agreement") and (ii) obtaining buyer protections

for a stalking horse purchase agreement that does not seek the assumption and assignment of the

License Agreement, the Debtors filed a new adversary proceeding (the "Second Adversary Proceeding") seeking the same relief sought in the First Adversary Proceeding, along with new claims that Roma violated the automatic stay and seeking damages.

2.      The Debtors did not file the Second Adversary Proceeding to protect any interest or prevent any harm to their bankruptcy estates.  Rather, the Debtors' sole purpose in asserting the Second Adversary Proceeding is to interfere with the legitimate business relationship between Roma and a new trademark licensee, and to maximize damage to Roma's business.  The purpose of the automatic stay is to provide debtors a "breathing spell" from creditors, prevent the depletion of estate assets, and avoid interference with the debtor's reorganization or liquidation.[1] The Debtors are attempting to use the automatic stay as a sword, not a shield, and the law is clear that the automatic stay is not intended for such use.[2] Yet, the Debtors have done exactly this— commencing two (2) separate adversary proceedings, each asserting, among other things, that Roma's pre-petition termination notices did not terminate License Agreement.

3.      By their own actions, the Debtors admit they have no legitimate interest in the now-terminated License Agreement.   First, the Debtors' voluntary withdrawal of the First Adversary Proceeding and counsel's representation that the dispute as to whether Roma validly terminated the License Agreement was "now moot" and "no longer a closing condition"[3]

---

[1]    *In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 696 (3d Cir. 1989); ("'The stay is not meant, however, to be used by a debtor to pursue its creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor.  Instead, the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors.'").

[2]    *In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) (quoting *In re Residential Capital, LLC*, 2012 Bankr. LEXIS 3624 (Bankr. S.D.N.Y. Aug. 7, 2012) ("The stay is not meant, however, to be used by a debtor to pursue it creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor.").

[3]    Hearing Transcript (Apr. 27, 2017) at 16:14-19 & 34:21-24 [Docket No. 161, Ex. A].

confirmed the Debtors' understanding that the License Agreement held no value to their bankruptcy estates.

4.      Second, the Debtors' lack of legitimate interest in the License Agreement is further manifested by changes they made to the stalking horse purchase agreement for the sale of their assets.  The Revised Stalking Horse Agreement (as defined below) does not seek assumption or assignment of the License Agreement.  It provides the stalking horse with two (2) alternatives.  Either (1) this Court would grant the extraordinary relief of (a) unilaterally extending the Sell-off Period[4] under the terminated License Agreement and (b) authorizing the assignment of the terminated License Agreement to a third party or (2) the stalking horse purchase agreement would be revised to reduce the purchase price by $2 million.  The Revised Stalking Horse Agreement is crystal clear that the Debtors are not seeking to assume and assign the License Agreement.

5.      Third, the Debtors have no ability to produce or sell Licensed Products after they sell all of their operations to the successful bidder at the auction scheduled for May 31, 2017.

6.      Fourth, the Debtors' amended budget [Docket No. 52-1] removed payment of royalties under the License Agreement, the payment of which would be required, if the Debtors sought to assume and assign the License Agreement.

7.      Finally, the License Agreement has no value to the Debtors, even if it had not been terminated and were permitted to be assigned.  Applicable trademark law prevents the sale of a trademark license to a party that has not purchased the business operations.  It is well-settled that a trademark is "assignable [only] with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the

---

[4]    The Sell-off Period arises only after termination of the License Agreement.  License Agreement ¶13(d).

mark."  15 U.S.C. § 1060; *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1990) ("The law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated") (citation omitted); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 621, 2006 U.S. Dist. LEXIS 23639, *18-19 (S.D.N.Y. 2006) (It is a "well-established principle that a mark is not property that may be assigned 'in gross' . . . . 'Trademark rights do not exist in the abstract, to be bought and sold as a distinct asset.'") (citations omitted).  Even if the License Agreement was not terminated (which it was) and it was assignable (which it is not), the Debtors do not retain any rights under the License Agreement separate from Rupari's business.  Here, because the Debtors cannot assign the License Agreement separate from their business, among other reasons, and because pursuant to the Revised Stalking Horse Agreement (defined below), the License Agreement is not assumed or assigned, there is no merit to the Debtors' assertion that the License Agreement holds any value after the asset sale.

8.       After withdrawal of the First Adversary Proceeding and the revision to the Stalking Horse Agreement, Roma was well within its rights to protect the value of its trademarks by entering into a new license agreement with a third party to continue production of its Licensed Products.  Because production and sale of the Licensed Products cannot commence without purchase of the proper equipment and numerous other arrangements, if Roma did not immediately arrange for a new licensee, it would suffer harm when production of its products ceased.  The License Agreement provides only a non-exclusive license during the six-month sell off period (the "Sell-off Period"), which started to run on March 27, 2017.  The intent is clear that the Sell-off Period is a transition period for a new licensee.

9.      Having no apparent practical or business purpose for filing the Second Adversary Proceeding, Rupari could only have been motivated by frivolous and improper reasons.

## II.      PROCEDURAL STATEMENT

10.      Roma files this Motion to prevent the Debtors from further efforts to harass and hurt the business of Roma.  First, the Debtors proclaimed an urgent need to assume and assign the License Agreement as required by a Stalking Horse Asset Purchase Agreement (the "Stalking Horse Agreement") between the Debtors and CBQ, LLC ("CBQ").  The Debtors filed the First Adversary Proceeding seeking a determination that Roma failed to terminate validly the License Agreement prior the petition date.  After Roma objected to (a) the expedited schedule for the adversary proceeding and (b) the bidding procedures (the "Bidding Procedures") proposed by the Debtors for the sale of their assets, the Debtors and CBQ amended the Stalking Horse Agreement [Docket No. 95] (the "Revised Stalking Horse Agreement") to remove the condition precedent requiring assumption of the License Agreement.  At the hearing on the Bidding Procedures, the Debtors and CBQ represented that the proposed sale was no longer conditioned on the assumption of the License Agreement.  Four days later, Rupari filed a notice of voluntary dismissal, without prejudice, of the First Adversary Proceeding.  At a telephonic status conference on May 2, 2017, Roma made clear that it would object to any attempt to assume or assign the License Agreement.  No assumption is possible because the License Agreement was terminated prior to the petition date of the Bankruptcy Cases, and even absent termination, applicable law prevents an assignment.  By dismissing the First Adversary Proceeding, Rupari confirmed that it would not seek to assume and assign the License Agreement in connection with the Revised Stalking Horse Agreement, and no proceeding remained before this Court challenging the validity of Roma's termination of the License Agreement.

11.     Despite the Debtors' representations and the impossibility of assigning the License Agreement, the Debtors included the License Agreement on the list of executory contracts that the Debtors may seek to assume and assign pursuant to a Notice to Counterparties to Executory Contracts and Unexpired Leases that May be Assumed and Assigned [Docket No. 121] (the "Cure Notice").  Roma objected [Docket No. 161] to the Cure Notice on the bases that (a) the License Agreement cannot be assumed and assigned as a matter of law; (b) the Debtors' only right to use the Licensed Marks[5] after termination of the License Agreement require compliance with the License's applicable provisions, including being current on all Royalty Payments[6] and Minimum Guarantees (as defined in the License Agreement); and (c) the amount asserted by the Debtors as a "cure" amount fell vastly short of the amount necessary to bring the Debtors' Royalty Payments current, which would require in excess of $4 million.

12.     After the Debtors (a) dismissed the First Adversary Proceeding and (b) obtained approval of the Bidding Procedures, which granted buyer protections under the Revised Stalking Horse Agreement, Roma reached an agreement to enter into a new license agreement with a third party (the "Third Party License Agreement").  On May 11, 2017, Rupari's counsel sent directly to management of Roma and the third party licensee a letter resurrecting the argument that the License Agreement was not validly terminated and asserting that entry into the Third Party License Agreement violated the automatic stay.  Second Compl. Ex. A.  The letter threatened to "re-file a modified adversary complaint" seeking "appropriate relief" if Roma did not

---

[5]     The Licensed Marks are defined as names, characters, symbols, designs and likenesses, including but not limited to copyrights, service marks, trademarks and trade names listed on a schedule to the License Agreement.

[6]     The License Agreement uses the term "Royalty Payments" to refer to payment of Royalties on a quarterly basis within thirty days following the end of each calendar quarter. The Royalties are set by a schedule attached to the License Agreement.

immediately rescind the Third Party License Agreement.  The letter falsely asserted that in

dismissing the First Adversary Proceeding, the Debtors relied on Roma's agreement to "explore

a consensual business solution" with Rupari.  Roma never considered reviving the License

Agreement due to Roma's serious issues regarding the quality of Rupari's production and its

performance as a licensee.  By the time Rupari's counsel sent Roma the May 11 letter, Rupari's

CEO had already issued – and Roma and its customers had already seen– a press release

characterizing Roma's entry into the Third Party License Agreement as a violation of the

automatic stay.  Roma responded to Rupari's May 11 letter on May 12, 2017 (the "Response ")

(attached hereto as Exhibit A), reiterating that Roma validly terminated the License Agreement

prior to the commencement of these Bankruptcy Cases, and that Roma had no influence on

Rupari's unilateral decision to withdraw the First Adversary Proceeding.  The Response stated

that the automatic stay did not apply to the terminated License Agreement, because it is not an

asset of the Debtors' estates.  As a result, Roma refused to rescind the Third Party License

Agreement.

13.    Roma has consistently and unequivocally made its legal position clear that: (a) the

License Agreement was validly terminated pre-petition, and (b) even if the License Agreement

had not been terminated, the Debtors cannot assume or assign the License Agreement without

Roma's express consent.  Both positions are well established under applicable law.

14.    Through this Motion, Roma seeks entry of an order determining as a matter of law

that even if the License Agreement had not been terminated, it cannot be assumed and assigned[7]

and, in an abundance of caution, in the event that the automatic stay could be applied to the

---

[7]    *See infra* § V.D.

License Agreement, seeking retroactive modification of the automatic stay to allow for Roma to move forward under the Third Party License Agreement.[8]

## III.    JURISDICTION AND VENUE

15.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* entered February 29, 2012, by the United States District Court for the District of Delaware.  This is a core proceeding under 28 U.S.C. § 157(b)(2) and the Court may enter an order consistent with Article III of the United States Constitution.  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

16.     The statutory bases for the relief requested herein are §§ 105(a), 362(d) and 365 of the Bankruptcy Code, Rules 4001 and 9013 of the Federal Rules of Bankruptcy Procedure, and Rules 4001-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

## IV.    BACKGROUND

### A.    The License Agreement and Roma's Termination Thereof

17.     Roma operates directly, and/or through its affiliates' franchises, full service, casual dining restaurants specializing in barbecued ribs and steaks, with more than 150 locations, in more than 30 countries, on five continents.  Tony Roma's name is one of the most globally recognizable names in the industry.  Roma was founded in Miami, Florida in 1972 and quickly became known for its signature barbeque sauces and rib preparations.

18.     The License Agreement is dated May 1, 2007 (as amended by the First Amendment, dated as of November 3, 2010; the Second Amendment, dated as of June 14, 2011; and the Third Amendment, dated as of October 29, 2013).  Compl. Ex. A; Second Compl. Ex. B.

---

[8]    *See infra* § V.E.

Pursuant to the License Agreement, Roma granted a trademark license to Rupari to produce, sell and distribute certain products under the TONY ROMA'S trademark.

19.    The License Agreement provided, among other things, a grant to Rupari of an exclusive license to utilize certain of Roma's licensed TONY ROMA'S marks (the "<u>Licensed Marks</u>") in connection with the manufacture, sale and distribution of certain refrigerated or frozen pork, beef, and poultry products ("<u>Licensed Products</u>").  The License Agreement required, among other things, that the Licensed Products be produced and packaged according to particular specifications, which Roma had to approve in writing.  The License Agreement required Rupari to comply with "all approval procedures which Licensor [Roma] determines are necessary, in its sole discretion."  License Agreement ¶ 6.  Rupari's territory to use the Licensed Marks was restricted to the United States, its territories and possessions, and U.S. military bases worldwide.

20.    Under the amended version of the License Agreement effective as of 2010, Rupari had renewal rights through June 30, 2030, provided that Rupari fully complied with the License Agreement during the prior terms and achieved certain minimum sales.  Roma also had the ability to terminate the License Agreement under certain circumstances.

21.    The License Agreement required Rupari to prepare and issue to Roma verified reports showing:  (i) total number or amount, by item, of Licensed Products sold, (ii) gross selling price, by item, of Licensed Products sold, (iii) itemized deductions, allowances, and returns applicable under the License Agreement, and (iv) the "Royalty Payment accrued during the quarter and payable to [Roma] by [Rupari]." *Id.* ¶ 3(d).  The License Agreement required Rupari to pay Royalty Payments on a quarterly basis, within 30 days following the end of each calendar quarter. *Id.* ¶ 3(e).  Past-due payments accrue interest at the rate of 1.5% per month. *Id.*

22.     Prior to the commencement of the Bankruptcy Cases and as part of a review of Rupari's deficient performance under the License Agreement, Roma engaged a third party to audit Rupari's books and records to determine the accuracy of Rupari's sales reports and Royalty Payments and whether additional amounts were due and owing through September 31, 2016 (the "Audit Period"), among other issues.  Rupari failed to cooperate fully with Roma's auditor and continues to withhold certain financial information necessary to complete the audit.  Based on the portion of audit results that were finalized, Roma gave written notice on January 16, 2017 that Rupari owed more than $3.5 million plus interest based on underpayments during the Audit Period (the "January 16 Letter").  Pursuant to the January 16 Letter, Roma further advised Rupari that if the royalty payments were not paid by February 15, 2017, Roma reserved its right to pursue all claims and damages against Rupari.  On January 18, 2017, Roma also gave Rupari written notice that Licensed Products, in Rupari packaging, were being sold outside of the U.S. in violation of the License Agreement (the "January 18 Letter").  The January 18 Letter referenced correspondence from almost a year prior, March 17, 2016, notifying Rupari of similar unauthorized out-of-territory sales.  The January 18 Letter stated that despite Rupari's promises, Roma had evidence that Rupari was continuing to sell to customers that were shipping Licensed Products outside of Rupari's authorized territory.  Roma demanded that Rupari cease its violations of the License Agreement and reserved its rights.  On March 2, 2017, Roma sent written notice that Rupari was in material breach of the License Agreement due to Rupari's: (a) failure to remit the past due royalty payments and (b) continued sale of Licensed Products to customers that were shipping Licensed Products outside of Rupari's authorized territory, among other defaults.  In addition, Roma requested information necessary to complete the audit and to understand the actions Rupari was taking to prevent the unauthorized, out-of-territory sales.

Roma reiterated its reservation of rights and stated that it did not waive any past defaults.  As a result of the written notices sent in January, Roma was entitled to terminate the License Agreement in accordance with Section 12 thereof, including giving notice, as early as February 15, 2017.

23.     Roma engaged in discussions with Rupari throughout this period in an attempt to resolve the parties' differences.  However, Rupari failed to cure any of the on-going material defaults.  Finally, after Rupari's continued failure to cure, on March 27, 2017, Roma sent written notice terminating the License Agreement in accordance with Section 12 (the "Termination Notice").  The License Agreement was therefore validly terminated prior to the petition date.

24.     Section 13(d) of the License Agreement provides that after expiration or termination, Rupari may sell, on a non-exclusive basis, Licensed Products that it has on hand or that are in the process of manufacture at the time of expiration or termination.  This Sell-off Period continues for a period of six months following the expiration or termination of the License Agreement, subject to certain conditions, including that "Royalty Payments and Minimum Guarantees are current."  License Agreement ¶ 13(d).  Pursuant to the License Agreement, Rupari is also required to provide Roma with a detailed, written account of the inventory of Licensed Products on hand and work in progress.  *Id.* To date, Rupari has neither paid royalties, nor provided Roma the information required during the Sell-off Period after repeated requests from Roma.

**B.      Rupari's First Adversary Proceeding Against Roma**

25.     On April 10, 2017 (the "Petition Date)," the Debtors filed voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

26.     On the same day, Rupari filed its Complaint in the First Adversary Proceeding, which is captioned, *Rupari Food Servs. v. Roma Dining, LLC, et al.*, Adv. Pro. No. 17-50345 (KJC). The Complaint requested a declaratory judgment that "Roma lack[ed] a legal basis to eliminate the License Agreement and/or that the contract was not terminated in accordance with the notice requirements of the License Agreement, and accordingly Roma's attempted termination of the License Agreement [was] void." Compl. ¶ 41.

27.     Rupari asserted two defenses to Roma's valid, pre-petition termination of the License Agreement:

      a.     the termination was not proper pursuant to the terms of the License Agreement; and

      b.     the breaches were waived, and the License Agreement was permanently amended by the parties' course of conduct.

28.     Concurrently with filing its Complaint, Rupari filed a Motion to Expedite Adversary Proceeding [First Adv. Docket No. 4] (the "Motion to Expedite"), seeking an order of this Court to schedule an evidentiary hearing on the First Adversary Proceeding within 60 days. On April 14, 2017, Roma filed an objection [First Adv. Docket No. 10] to the Motion to Expedite, stating that the fact-intensive nature of Rupari's excuses and the scope of the requested discovery prevented a trial of the First Adversary Proceeding in 60 days.

29.     At a hearing held on April 17, 2017, the Court scheduled trial dates for July 10-12, 2017 and instructed the parties to confer regarding an appropriate scheduling order.

30.     On April 20, 2017, Rupari filed a Bankruptcy Rule 7041 Notice of Voluntary Dismissal [First Adv. Docket No. 20] dismissing, without prejudice, the Adversary Proceeding.

C.    **The Sale Motion**

31.    On April 11, 2017, the Debtors filed the *Motion of Debtors for Entry of Order*
*(I) (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of*
*Substantially All Assets; (B) Approving Stalking Horse Protections; (C) Approving Procedures*
*Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,*
*(D) Approving the Form and Manner of Notice Thereof; (II) (A) Approving and Authorizing Sale*
*of Substantially All of Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims,*
*Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain*
*Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief*
[Docket No. 27] (the "Sale Motion").  The Sale Motion identified CBQ as the Stalking Horse
purchaser pursuant to the Stalking Horse Agreement for the purchase of substantially all of
Rupari's assets.  The Stalking Horse Agreement required, as a condition precedent the entry of a
final order a:

> . . . finding that the [License] Agreement is in full force and effect,
> assigning the [License] Agreement to Buyer, approving Buyer's
> assumption of the [License] Agreement, providing that Seller is
> responsible for all Cure Costs associated with the [License]
> Agreement, providing that Buyer shall have no Liability for any
> Cure Costs associated with the [License] Agreement, and
> prohibiting the counterparty to the [License] Agreement from
> terminating or modifying its performance under the [License]
> Agreement as [a] result of non-payment of the Cure Costs by the
> Seller (the "Assignment Order").

Stalking Horse Agreement, Art. 9.2(i).

32.    On April 20, 2017, Roma filed an objection to the bidding procedures proposed by
the Sale Motion [Docket No. 72] (the "Bidding Procedures Objection").  In the Bidding
Procedures Objection, Roma objected to entry of an order approving the bidding procedures on
the basis that the proposed transaction could not be consummated, because it depended on the

validity of the License Agreement, which Roma properly terminated. Roma also stated that, even if the Court found that License Agreement was not validly terminated, the License Agreement and well-settled trademark law required Roma's express consent in order to assume the License Agreement and assign it to a purchaser. Given Roma's dissatisfaction with Rupari's manufacture of the Licensed Products, Roma would not give consent absent significant capital improvements to existing operations.

33.     During the evening of April 26, 2017, the Debtors filed the Revised Stalking Horse Agreement which removed the sale condition requiring entry of an Assignment Order and replaced it with the following provision:

> The Parties shall have either (i) received a Sale Order entered by the Bankruptcy Court as a Final Order that authorizes Buyer to buy, manufacture and sell Inventory under the Tony Roma's brand for six (6) months following the Closing (the "*Sell Off Period*") and provides that in exchange for the Sell Off Period, Roma Dining LP shall receive royalties as provided in Section 3 of the [License] Agreement for sales made by Buyer during the Sell Off Period, or (ii) entered into an amendment to this Agreement providing for a an additional escrow amount and a potential adjustment of the Purchase Price in an amount of Two Million Dollars ($2,000,000) to account for all inventory, supplies, packaging, or finished goods relating to the [License] Agreement and purchased by Buyer hereunder, and unused and unsaleable within a reasonable period of time as of the Closing Date, assuming for this purpose that the [License] Agreement was terminated as of the Closing Date with Buyer having no further right to operate under the [License] Agreement for any additional period.

34.     At a hearing the next morning on the Bidding Procedures on April 27, 2017, Roma objected to the revised Stalking Horse Agreement to the extent that the Debtors sought unilaterally to extend the term of the Sell-off Period beyond six months following termination of the License Agreement on March 27, 2017.

35.     At the same hearing,

    a.     the Debtors represented that:

        i.     The dispute as to whether Roma validly terminated the License Agreement was "now moot" and "no longer a closing condition." Hearing Transcript (Apr. 27, 2017) at 16:14-19 & 34:21-24.

        ii.     If the Debtors could not obtain a sale order that authorizes an extension of the Sell-off period, they "have the escrow accounts of $2 million." *Id.* 35:4-9.

    b.     CBQ represented that, "[t]he current APA does not contemplate an assumption of the [License Agreement]" and that the APA alternatively seeks a six-month Sell-off Period or a purchase price reduction. *Id.* 29:22-30:12.

    c.     Roma represented that:

        i.     "To the extent the Debtors attempt to assume the License Agreement or grant themselves a unilateral extension of the Sell-off Period, Roma would continue to assert its objections." *Id.* 25:16-25.

        ii.     "The new provision is seeking an extension of [the Sell-off Period to] six months after the closing, and we don't agree with that." *Id.* 26:2-4.

## D.     The Cure Notice

36.     On May 2, 2017, the Debtors filed the Cure Notice, which identified the License Agreement as an executory contract that may be assumed and assigned by the Debtors.  The Cure Notice proposes a Cure Amount of $461,620.45.

37.    Because the License Agreement cannot be assumed and assigned, the concept of a "cure" is inapplicable.  However, Roma notes that according to its records, the Debtors owe Roma:  (i) approximately $3,598,943 for royalties during the Audit Period, (ii) all royalties due and owing under the License Agreement during the first quarter of 2017, and (iii) $40,220, representing the deficiency of Rupari's royalty payment for the last quarter of 2016.

38.    While Rupari had provided Roma with an unverified statement regarding product sold and royalties due for sales in the first quarter of 2017, to date, it has not paid any royalties for such period.

**E.    Rupari's Second Adversary Proceeding Against Roma and Events Preceding Same**

39.    In furtherance of the Debtors' continued assault on Roma and its lawful rights, on May 16, 2017, the Debtors filed the Second Adversary Proceeding against Roma and the counterparty to the Third Party License Agreement, asserting a violation of the automatic stay, seeking damages, seeking a declaratory judgment that the License Agreement was not validly terminated, and alleging unjust enrichment.  Roma can discern no proper basis or purpose for such filing.

40.    As discussed above, Roma validly terminated the License Agreement on March 27, 2017, and accordingly, the Debtors' ability to produce and sell the Licensed Products are authorized solely under the terms of the Sell-off Period.  In light of the Debtors' representations that they no longer sought to assume and assign the License Agreement in connection with the Revised Stalking Horse Agreement, and the withdrawal of the First Adversary Proceeding, Roma sought to protect its business interests and the value of its trademarks by entering into the Third Party License Agreement.  On May 10, 2017, Roma issued a press release announcing the Third Party License Agreement with a new licensee for the manufacture and marketing of products in

the U.S., which will be prepared using modern cooking technology and taste just like products sold in Roma's restaurants.

41.    On May 11, 2017, for the sole purpose of interfering with Roma's business relationships and otherwise harm Roma's business, Rupari issued a press release (the "Press Release") improperly asserting that Roma entered into the Third Party License Agreement "in violation of Rupari's exclusive rights under its license with [Roma]."[9]  The Debtors' CEO, Jack Kelly, further improperly stated that the Third Party License Agreement "clearly interferes with our exclusive property rights under the [License Agreement] and automatic stay imposed by the Bankruptcy Code," that Rupari believes the License Agreement is still in full force and effect, and that Rupari intends "to pursue all available legal remedies" against Roma and the new licensee.  The Press Release added that the dispute between Roma and Rupari will not "impact the timing of the sale of the business in June."  The Press Release also included a statement by management of the stalking horse bidder, Bob Buddig of CBQ, that CBQ "remains committed to moving forward with the transaction."

42.    On the same date, Rupari's bankruptcy counsel sent directly to management of Roma and the third party licensee a letter asserting:  (a) that the Debtors continue to have the exclusive right to sell and distribute Licensed Products through 2030, "assuming certain conditions are met;" (b) Roma's termination of the License Agreement was invalid; (c) "Rupari dismissed the adversary complaint without prejudice so the parties could explore a consensual business solution between the parties;" (d) Roma's entry into the Third Party License Agreement "indicates that Roma had no intent to engage in good faith negotiations;" (e) rights under the License Agreement are property of the Debtors' bankruptcy estates; and (f) the Third Party

---

[9]    Every aspect of this statement is false, including the description of Rupari's license as being "exclusive."

License Agreement violates the automatic stay established by §362(a)(3) of the Bankruptcy Code.  Rupari illegally demanded rescission of the Third Party License Agreement and for Roma to perform under the terminated License Agreement, or else Rupari would "re-file a modified adversary complaint with the Bankruptcy Court and seek appropriate relief."

43.    On May 12, 2017, Roma's counsel sent Rupari's counsel the Response, which stated that:  (a) the License Agreement was properly terminated and is no longer in existence or effect, save for the post-termination Sell-off Period; (b) Rupari never cured its breaches of the License Agreement identified by Roma in its January 2017 letters or underpayments identified pursuant to Roma's audit; (c) Rupari has taken no action to prevent Licensed Products from being improperly sold outside the United States, including, as recently discovered, in Curacao; (d) Roma had no involvement in Rupari's unilateral decision to withdraw the First Adversary Proceeding and in no way engaged in discussions with Rupari related to anything other than transition-related issues and the Sell-off Period; (e) Rupari admitted in its letter that Royalties must be paid to maintain the License Agreement, yet the chapter 11 budget does not provide for payment of the Royalties; (f) Roma's entry into the Third Party License Agreement does not violate the automatic stay because the License Agreement was terminated and is not part of the bankruptcy estates; (g) in order to preserve Sell-off Period rights provided for by the terminated License Agreement, Rupari must satisfy conditions required in the License Agreement; and (h) identifying certain domain names improperly registered by Rupari, in violation of the License Agreement that must be transferred immediately.  Rupari has not satisfied Roma's demands to pay Royalties necessary to preserve Sell-off Period rights, or to transfer its improperly registered domain names.

44.     On May 16, 2017, Rupari filed the Second Adversary Proceeding, styled as a Complaint for Violation of the Automatic Stay and Other Relief in the adversary proceeding captioned, *Rupari Food Servs. v. Roma Dining, LLC, et al.*, Adv.  Pro.  No. 17-50482 (KJC). The Second Complaint falsely accuses Roma of misappropriating assets of the Debtors' estates in violation of the automatic stay, causing damages to the bankruptcy estates in the form of lost goodwill and lost sales, and, despite informing this Court that the Debtors' allegations in the First Adversary Proceeding were moot, accuses Roma of creating "uncertainty and confusion" that interferes with Rupari's bankruptcy sale efforts by "dissuading potential purchasers to participate."  Second Compl. ¶¶ 5 & 41.

45.     The Second Complaint asserts substantially the same allegations and defenses as the Complaint in the First Adversary Proceeding, but adds claims for violation of the automatic stay, breach of the exclusivity provision of the License Agreement, and unjust enrichment. Counts I-III & V.  It reiterates the assertion that the parties altered the License Agreement through their course of conduct and dealings, despite clear language in the License Agreement preventing such amendment.  *Id.* ¶¶ 22, 23 & 29.

## V.     ARGUMENT

46.     Section 362 of the Bankruptcy Code provides that, upon filing of a petition for bankruptcy relief, certain actions against the bankruptcy debtor are automatically stayed, including "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a).  The automatic stay is applicable to executory contracts belonging to a bankruptcy estate, however, it is inapplicable to property that is not part of the estate as of the petition date. 3-362 Collier on Bankruptcy P 362.03 (Alan N. Resnick & Henry J. Sommer eds.).  Where a contract has been terminated prior to the petition date, it is not part of the debtor's estate. *In re Robertson*, 147 B.R. 358, 361 (Bankr. D.N.J. 1992) (citing *In re*

*Triangle Laboratories, Inc.,* 663 F.2d 463 (3d. Cir. 1981)).  "It is settled law that a lease or license that was terminated before the filing of a bankruptcy petition is neither affected by the automatic stay under 11 U.S.C. § 362(a) nor may it be assumed by the debtor under 11 U.S.C. § 365."  *In re Scarsdale Tires, Inc.*, 47 B.R. 478, 480 (Bankr. S.D.N.Y. 1985).

**A.    The Automatic Stay Is Inapplicable To The License Agreement Because it Was Terminated Prior To The Petition Date**

47.    As repeatedly set forth in Roma's various filings, and on the record during proceedings before the Court in both the Bankruptcy Cases and the First Adversary Proceeding, the License Agreement was validly terminated pursuant to Roma's notice dated March 27, 2017.

48.    Because the License Agreement was terminated prepetition, it cannot be assumed or assigned by the Debtors.  *See In re Scarsdale*, 47 B.R. at 480; *Counties Contracting and Const.  Co. v. Constitution Life Ins.  Col.*, 855 F.2d 1054, 1061 (3d. Cir. 1988) ("Once a contract ends, a debtor's rights, such as to assume, ends as well."); *In re Triangle Laboratories, Inc.,* 663 F.2d 463 (3d. Cir. 1981) ("(F)or Section 365 to apply, the contact or lease must be in existence.  If the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the trustee to assume or assign.") (internal quotations omitted); *In re Clearpoint Business Resources, Inc.*, 442 B.R. 292 (Bankr. D. Del. 2010) (quoting *Counties Contracting* for proposition that contract validly terminated prepetition terminates a debtor's right to assume it)).

49.    The only rights available to the Debtors under the License Agreement are the rights permitting the post-termination Sell-off Period, and then only if certain conditions are satisfied.  Aside from the Sell-off Period rights, the Debtors have no interest in the License Agreement, and specifically have only a non-exclusive right to utilize the Licensed Marks during the Sell-off Period.  As such, the automatic stay imposed by §362 of the Bankruptcy Code is not

applicable to Roma's right to enter into a new license for its trademarks.  *See In re Scarsdale*, 47 B.R. at 480.  Accordingly, the Debtors' assertions that Roma's entry into the Third Party License Agreement violates the automatic stay are baseless and incorrect.  Roma has not violated the automatic stay with respect to any portion of the License Agreement, including the Sell-off Period.

50.     The Debtors' arguments that the License Agreement is a valuable asset of their bankruptcy estates are not credible, because the Debtors cannot produce or sell Licensed Products after the asset sale.  Once a purchaser closes a sale transaction, the Debtors will lack the premises, equipment, inventory, and other resources to perform under the License Agreement.  *See* Revised Stalking Horse Agreement at § 1.1.  Moreover, the Revised Stalking Horse Agreement does not call for the assumption and/or assignment of the License Agreement.  Therefore, as a matter of both law and practicality, neither the Debtors nor any purchaser can perform under the License Agreement past the closing date of a sale transaction.

51.     Further, as set forth above, a trademark license cannot be sold to a party that has not purchased the related business operations.  As a result of Roma's termination of the License Agreement and the realities of the Debtors' sale process, Rupari has no rights for the automatic stay to protect.  The automatic stay is therefore inapplicable to the License Agreement.

**B.     The Court Can And Should Determine That The License Agreement Cannot Be Assumed And Assigned As A Matter Of Law And Without Need For Discovery Or Factual Determinations**

52.     In the Bidding Procedures Objection, Roma fully briefed the legal and factual reasons that the License Agreement could not be assumed and/or assigned, even if it had not been terminated prior to filing the Bankruptcy Cases.  For the convenience of the Court, the arguments are reiterated here.

53.     Even if this Court determines that the License Agreement has not been terminated, Rupari cannot assume or assign it without Roma's express written consent.[10]

54.     It is well settled that a trademark license cannot be assumed or assigned without the express written consent of the license holder.  The only reported decision analyzing whether a license agreement provision that prevents the licensor from unreasonably withholding its consent held that such a provision does not constitute a waiver of licensor's right to consent.  Nor does such a provision authorize the assumption or assignment of a trademark license without the licensor's consent. [11]

55.     Bankruptcy Code §365(c) provides an exception to the general rule that anti-assignment provisions are not enforceable to prevent a debtor in possession from assuming and/or assigning an executory contract.   Under §365(c), a debtor cannot assume or assign an executory contract if: (i) applicable law excuses the non-debtor party from accepting performance of the contract from an entity other than the debtor and (ii) the non-debtor does not consent to the assumption or assignment of the contract. [12]  This exception applies "whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties . . . ."[13]  In *Trump Entertainment Resorts*, [14] Judge Gross held that subsection 365(c) provides a

---

[10]    *In the event this Court determines that the License Agreement has not been terminated, Roma does not dispute that the License Agreement would be an executory contract.*

[11]    *Wellington Vision, Inc. v. Pearle Vision, Inc. (In re Wellington Vision, Inc.)*, 364 B.R. 129 (S.D. Fl. 2007).

[12]    Section 365(c) provides "The trustee may not assume or assign any executory contract or unexpired lease of the debtor" if:
            (1)(A) applicable law excuses the non-debtor from accepting performance from an entity other than the debtor; and
            (B) such parties does not consent to such assumption or assignment.  *Id.* § 365(c).

[13]    *Id.*

"carefully crafted exception . . . " to the general rule that anti-assignment provisions are not enforceable against debtors in possession.[15]

56.    Courts have consistently held that the application of federal trademark law pursuant to Bankruptcy Code §365(c) renders trademark licenses unassignable.  In the *Trump Entertainment Resorts* case, Judge Gross held that "'as far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment.'"[16]

57.    The Seventh Circuit, in the *XMH* case, held that if a trademark license is silent on the issue of assignment, it falls within the general rule that trademark licenses cannot be assigned absent express consent.[17]  The Seventh Circuit reasoned that the purpose of a trademark is to identify a good or service to enable consumers to rely on the mark for consistency and quality of the product or service.[18]  The most efficient method to monetize a trademark may be to license the right to use the mark on particular goods or services to another company that may have lower costs of production, specialized expertise, or other advantages over the trademark owner.  As a result, the trademark owner would not want the trademark licensed to a party lacking such advantages or expertise, or in circumstances that would put at risk the trademark owner's ability to control the quality of goods or services sold under its mark.  The Seventh Circuit reasoned

---

[14]    *See In re Trump Entm't Resorts, Inc.* 526 B.R. 116 (Bankr. D. Del. 2015).

[15]    *Id.* at 123.

[16]    *Id.*  (quoting *In re XMH Corp.,* 647 F.3d 690, 695 (7th Cir. 2011)); *see also In re Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004).

[17]    *XMH,* 647 F.3d at 696.

[18]    *Id.* at 695.

that, to achieve this result, the general rule provides that trademark licenses are not assignable without the express permission of the brand owner.[19]

58.     Some courts have held that, despite the general rule that trademark licenses are not assignable without express consent, private parties can, by mutual agreement, waive this protection.[20]  However, a licensor's agreement to allow transfers in limited circumstances does not constitute the licensor's consent to assignment in all other circumstances.  In the *Wellington Vision* case, the District Court for the Southern District of Florida found that where a trademark license agreement prevented the licensor from unreasonably withholding its consent to a transfer, that provision did not waive the general rule against assignability.  The provision analyzed by the Court was virtually identical to the one contained in the License Agreement at issue here.  The trademark license agreement in *Wellington* provided that "consent to such transfer and sale shall not be unreasonably withheld."  The *Wellington* court found that "a clause against unreasonable withholding of consent is not the equivalent of a clause expressly allowing assignment without consent," and held that "the parties have not therefore 'opted out' of the Lanham Act's restrictions [against assignment] simply by agreeing that PVI [licensor] would not unreasonably withhold consent."[21]

59.     In the *Trump Entertainment Resorts* case,[22] Trump AC Casino Marks, LLC sought relief from the automatic stay to terminate its trademark license agreement with the

---

[19]   *Id.* at 696.

[20]   *See Wellington*, 364 B.R. 129.

[21]   *Id.* at 136.

[22]   *Trump,* 526 B.R. at 123 (assessing application of §365 to trademarks) (citing *XMH*, 647 F.3d at 695 ("as far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment")); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d

debtor, Trump Entertainment Resorts, Inc., which sought to assume the trademark licenses

pursuant to a plan of reorganization.  In granting relief from the stay, Judge Gross espoused the

general rule that trademark licenses cannot be assumed or assigned absent express licensor

consent.  Judge Gross also held that his decision did not distinguish between exclusive and non-

exclusive trademark licenses.  Judge Gross reasoned that:

> The distinction between exclusive and non-exclusive licenses is
> simply not relevant in the trademark context.  The general
> prohibition against the assignment of trademark licenses absent the
> licensor's consent is equally applicable to both exclusive and non-
> exclusive trademark licenses.  A trademark licensor would have
> the same concerns with respect to the identity of the licensee and
> the quality of products bearing its trademark whether the
> trademark license is exclusive or non-exclusive.  Thus, a rule
> distinguishing between exclusive and non-exclusive licenses for
> purpose of assignability makes little sense in the trademark
> context.[23]

60.     The case law is clear that §365(c) prevents the assignment of the License

Agreement without Roma's express consent.  However, even if this Court were to reach the issue

of whether any refusal by Roma to consent was "unreasonably withheld," there would be ample

justification for such a refusal.  We have not found any bankruptcy cases where a court

considered whether a trademark licensor's refusal to consent to an assignment of a license was

reasonable.  However, bankruptcy cases outside of the trademark context have found that a

prohibition against unreasonable withholding of consent requires a substantial, subjective basis

for the refusal, but does not require that the decision to withhold consent be objectively correct.[24]

---

975, 988, 992-93 (9th Cir. 2006); *N.C.P. Mktg. Group, Inc. v. Billy Blanks (In re N.C.P. Mktg. Group, Inc.)*, 337 B.R. 230, 235-37 (D. Nev. 2005)).

[23]    *Trump,* 526 B.R. at 127.

[24]    *In re Van Ness Auto Plaza*, 120 B.R. 545, 549 (Bankr. N.D. Ca. 1990) (applying standard used in assignment of leases).

In the *Claremont Acquisitions* case, the District Court in the Central District of California applied such a standard in analyzing a refusal to consent to the transfer of an automobile dealership under California state law. The Court concluded that, due to the closeness of the relationship between a car manufacturer and a dealership, "a manufacturer's refusal to consent to assignment of its automobile franchise should be afforded even greater deference than is commonly granted lessors in a decision to withhold consent." [25] On that basis, and in light of the evidence of record, the District Court reversed an order of the Bankruptcy Court compelling assignment of the dealership agreement.

61.     Were this Court to analyze whether a refusal by Roma to consent to the assignment of the License Agreement was reasonable – which is an issue the Court should not reach – the standard applied in the *Claremont Acquisitions* case would preclude an assignment, due to Roma's rights to control the quality of its Licensed Products. Under that standard, if Roma has any valid concerns about a buyer's ability to adhere to Roma's quality control standards, its expertise or experience, or the planned, ongoing involvement of Rupari personnel whose performance to date has been seriously deficient, then Roma would be well justified in refusing to consent to the assignment of the License Agreement.

## C.     Cause Exists To Retroactively Modify The Automatic Stay Because The License Agreement Has No Value To The Debtors

62.     In an abundance of caution, Roma requests this Court retroactively to lift the automatic stay to prevent Debtors' continued interference and damage to Roma's business. Section 362(d) of the Bankruptcy Code authorizes a party in interest to seek relief from the automatic stay. [26] A moving party may obtain relief from the automatic stay "for cause." [27]

---

[25]   *In re Claremont Acquisitions Corp., Inc.*, 186 B.R. 977, 986 (C.D. Cal. 1995).

[26]   11 U.S.C. § 362(d).

While "cause" is not defined by the Bankruptcy Code, courts in the Third Circuit look to the following factors to determine the existence of cause to lift the stay: (1) prejudice to the estate or the debtor, (2) hardship to the moving party resulting from maintenance of the stay weighed against hardship to the debtor, and (3) probability of success of the moving party on the merits.[28]

63.     Should the Court consider the automatic stay applicable to Roma, cause exists for the Court to grant Roma retroactive relief from the automatic stay. As discussed above, the License Agreement has no value to the Debtor even if it had not been terminated, because, the Debtors cannot assume and/or assign the License Agreement as a matter of applicable trademark and bankruptcy law. As a result, the Debtors have no ability to use the License Agreement after consummation of the asset sale. The Debtors would suffer no prejudice as a result of the Court granting Roma retroactive relief from the automatic stay to permit Roma to transition its retail business to a new licensee.

64.     In contrast to the Debtors, Roma stands to endure continued and severe prejudice to its business by endangering the use of its trademarks, because the Debtors seek to interfere with Roma's ability to provide for production and sale of the Licensed Products after closure of the asset sale. Cessation or a lapse in production of goods bearing the Licensed Marks could cause Roma to suffer harm to its brand, including loss of goodwill among retailers and consumers, as well as financial loss due to an inability to exploit the Licensed Marks, which indisputably belong to Roma. So long as Roma is unable to use the Licensed Marks, Roma is also at risk of losing its rights to the Licensed Marks, as it is a basic tenant of trademark law that trademark rights arise out of use of the trademark. *See* 15 U.S.C. § 1125(a). Given the legal and

---

[27]   *Id.* § 362(d)(1).

[28]   *Trump Entm't Resorts, Inc.*, 526 B.R. at 120-21 (Bankr. D. Del. 2015) (citing *Izzrelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)).

practical impossibility for the Debtors or their successors to have any continuing interest in the License Agreement, Roma should not be forced to endure such prejudices by virtue of the automatic stay.

65.     Application of the automatic stay against Roma would additionally enable the Debtors to damage Roma's business, as they did by issuing the false Press Release.  Granting Roma relief from the automatic stay as requested herein would discontinue any ongoing and further efforts by the Debtors to invoke the automatic stay for purposes that are at least dubious, if not baseless, and result in unnecessary burdens to Roma and the resources of the estates and the Court.

66.     For the same reasons set forth above, Roma submits that the hardship presented to Roma should the Court deny it relief from the automatic stay to transition its licensing arrangements outweighs any hardship presented to the Debtors should the Court grant the requested relief.  Imposition of the automatic stay against Roma would impact Roma's ongoing business operations, whereas the Debtors can only exploit remaining available rights under the License Agreement for a short time longer, until closing of a sale transaction.  Even then, notwithstanding the Debtors' failure to fulfill the License Agreement's requirements for the Sell-off Period, Roma has not sought, and has no present intentions of seeking, for the Debtors to cease selling Licensed Products pursuant to the Sell-off Period provisions of the License Agreement.

67.     Out of an abundance of caution, Roma requests that the Court lift the automatic stay retroactively and validate Roma's actions, including entry into the Third Party License Agreement, which the Debtors allege to have violated the automatic stay.  There is ample

authority for the Court to grant retroactive relief.[29]  Roma submits that lifting the stay

retroactively is justified herein because the cause to grant relief from the automatic stay

described herein has existed since the outset of the Bankruptcy Cases, and equity favors such

relief given the impact that the automatic stay, if it even applies, would have on Roma's rights to

license its trademarks.[30]  Moreover, given the Debtors' voluntary dismissal of the First

Adversary Proceeding and representations it would not seek to assume or assign the License

Agreement, Roma had no reason to believe its entry into the Third Party License Agreement

breached the automatic stay.[31]

**D.     By Their Actions, The Debtors Have Conceded That The Automatic Stay Does Not Apply to Roma**

68.     In the Second Adversary Proceeding, the Debtors seek to protect alleged rights that

they sought to establish, but then abandoned, through the First Adversary Proceeding.  The

Complaint and Second Complaint each allege a claim for a declaratory judgment that Roma

lacked a legal basis to terminate the License Agreement and that Roma's termination of the

License Agreement is void.  Compl. ¶ 41; Second Compl. ¶ 53.  Rupari's additional claims

against Roma in the Second Complaint are based on the same premise that the License

Agreement was not validly terminated.   The Debtors' initiation of the Second Adversary

Proceeding occurred just two weeks after their voluntary dismissal of the First Adversary

Proceeding.  The Debtors concede in the Second Complaint that they withdrew the First

---

[29] *See In re Siciliano*, 13 F.3d 748, 751 (3d Cir. 1994) (finding the automatic stay may be annulled retroactively).

[30] *See In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007) (describing "balancing the equities is the appropriate test" for determining whether to annul the automatic stay retroactively and considering factors for the same).

[31] *See id.*

Adversary Proceeding because the Debtors' sale of their assets can be accomplished without a judicial determination of the declaratory judgment claim.  Second Compl. ¶ 38.

69.     The Second Complaint makes clear that the Debtors did not have a proper purpose in filing it.  As discussed above, the Debtors have no practical or viable interest in the License Agreement subsequent to the closing of a sale of their assets, and a sale is no longer premised on a finding that the License Agreement is valid.  Their initiation of the Second Adversary Proceeding is nothing more than (i) an attempt by the Debtors to bolster marketing of their assets by conjuring the illusion that the License Agreement remains valid, and (ii) malice designed to hurt Roma's legitimate business interests in attempting to protect its trademarks and sully Roma's reputation in retaliation for termination of the License Agreement.  Neither is a compelling or proper reason to seek damages and waste the resources of this Court, the estates, and Roma.  Had the Debtors believed they had continuing rights under the License Agreement, they would have pursued discovery under the agreed-upon schedule in the First Adversary Proceeding.  In evaluating the Debtors' claims in the Second Adversary Proceeding, this Court should weigh the Debtors' abandonment of the First Adversary Proceeding and the Debtors' admissions that its resolution was not necessary for the asset sale, which will substantially accomplish the Debtors' chapter 11 goals.[32]

E.      **Damages Are Available Only For Individuals – Not Corporations—Under Section 365(k)**

70.     The Debtors' true intentions are laid bare by their demand for monetary damages, despite applicable law and lack of actual damages.  Section 365(k) provides:

> (1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall

---

[32]  *See* Decl. of Jack Kelly [Docket No. 19], at ¶ 35 ("The Debtors commenced these Chapter 11 Cases to sell their business as a going concern to the highest or otherwise better bidder . . . .").

recover actual damages, including costs and attorney's' fees, and in appropriate circumstances, may recover punitive damages.

(2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

71.    The majority view of §362(k) holds that fictitious entities such as corporations and partnerships may not seek damages for stay violations.[33] The plain language of §362(k) applies only in cases in which the debtor is an "individual." While the Bankruptcy Code does not define the term "individual," it does define the term "person," which includes an "individual, partnership, and corporation . . . ."[34] Courts have held that "Congress clearly did not intend the term 'corporate debtor' to be used interchangeably with the term 'individual debtor,' as such a construction would render meaningless employment by Congress of the term 'individual.'"[35] In the definition of "person" in §101(41), "Congress recognizes that an individual is someone other than a partnership or corporation."[36]

---

[33]    *See, e.g., Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 193 & 194 (10th Cir. BAP 2015) (Damages are available only for natural persons, not corporations or partnerships); *see also Rafter Seven Ranches L.P. v. WNL Investments L.L.C. (In re Rafter Seven Ranches, L.P.)*, 414 B.R. 722, 733 (10th Cir. BAP 2009) (Partnership is not entitled to an award of damages for a stay violation); *Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.),* 318 B.R. 1, 4 (D. Mass. 2003), *aff'd* 346 F.3d 1 (1st Cir. 2003) ("Interpreting 'individual' in §362(h) to exclude corporations is 'coherent and consistent' with the rest of the Code . . . .") (quoting *Ron* Pair, 489 U.S. 235, 240-1 (1989)); *Just Brakes Corp. Systems, Inc. v. Reinert & Duree, P.C. (In re Just Brakes Corp. Systems, Inc.)*, 108 F.3d 881, 884-5 and n.4 (8th Cir. 1997) (Damages for stay violation not available to corporate entities, overruling assumption in earlier case that damages were available to businesses); *Jove Engineering, Inc. v. Internal Revenue Service (In re Jove Engineering, Inc.)*, 92 F.3d 1539, 1550 (Term "individual" does not include a corporation for purposes of awarding damages for a stay violation); and *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-7) (Damages for violating the automatic stay may be awarded only to debtors that are natural persons.)

[34]    11 U.S.C. § 101(41).

[35]    *In re Gordon's Music and Sound, Inc.*, 2012 WL 8250009 at *2 (Bankr. E.D. CA. 2012)

[36]    *Id.*

72.     The Bankruptcy Code uses the term "individual" in other sections as well.  For example, Chapter 13 is limited to an "individual with regular income," which is defined in § 101(30) as "a natural person, excluding artificial entities such as corporations or partnerships." The court in *Gordon's Music* found "no basis for concluding, as asserted by the Plaintiff, that Congress intended to enact *sub silentio* a different definition in the term individual as used in 11 U.S.C. §523 from the definition of that term in the rest of the Bankruptcy Code."[37]

73.     After the adoption of the newly-numbered §362(k), courts have looked to the language in the newly-added second paragraph to assist in their analysis of §362(k).  One court held that use of the  term "entity" so close to the term "individual" meant that Congress knew the difference and used the more restrictive term "individual" in paragraph (1).[38]

> In amending former section 362(h), Congress easily could have changed the term "individual" to a more inclusive and defined term such as "person" or "entity."  Not only did Congress retain the restrictive term, it added the more inclusive term "entity" in the very next sentence.  The addition of "entity" in such close proximity to "individual" is strong evidence that Congress was aware of the distinction between terms and deliberately chose to retain the more marrow term in the new 362(k).[39]

74.     The Court in *In re Glenn* held that the evidence provided by the BAPCPA amendments to §362(k) was determinative.

> The conclusion by one court that 'individual' is [sic] section 362(h) is synonymous with 'entity' simply cannot stand in light of the BAPCPA amendment.  Use of the two different terms is [sic] such close proximity compels the conclusion that different meanings are intended.[40]

---

[37]    *Id.*

[38]    *In re Glenn*, 379 B.R. 760, 763-4 (Bankr. N.D. Ill. 2007).

[39]    *Id.*

[40]    *Id. at* 765 n.2.

75.    Although the Third Circuit in the *Atlantic Business and Community Corp.*[41] case stated in *dicta*, and without analysis, that the former provision, codified as §362(h), was applicable to corporate debtors, the reasoning is contrary to the Supreme Court's well-established rule that the "plain meaning" of a statute controls.[42]  Pursuant to the plain meaning of §362(k), the term "individual" could not have the same meaning as the word "entity," which appears in the next sentence.[43]

76.    "Since the Second Circuit first held in 1990 that a corporation is not an 'individual' no circuit court addressing the question for the first time has held otherwise."[44]  The Eighth Circuit, which had initially "assumed" that Congress meant to allow corporate debtors to seek damages for stay violations, reversed its conclusion when a case required the Court to analyze the specific language of former §365(h).[45]  Cases addressing the specific question whether the precursor to §362(k) applies to corporate entities have held that damages may only be sought by natural persons—not other entities.[46]  Prior to the adoption of the revised §362(k),

---

[41]    *Cuffee v. Atlantic Business and Community Corp. (In re Atlantic Business and Community Corp.)*, 901 F.2d 325, 329 (3d. Cir. 1990).

[42]    *See Ransom v. FIA Card Servs., N.A.,* 562 U.S. 61, 69 (2011) ("Our interpretation of the Bankruptcy Code starts 'where all such inquires must begin: with the language of the statute itself.'")(quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989)); *Milavetz, Gallop & Milavetz, P.A. v. United States,* 559 U.S. 229, 253 (declining to adopt interpretation of the Bankruptcy Code that is contrary to the plain meaning of the statute); *Carcieri v. Salazar*, 555 U.S. 379, 392 (2009) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (Quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992).

[43]    *See supra* note 34.

[44]    *Spookyworld,* 318 B.R. at 4.

[45]    *Just Brakes Corp. Systems, Inc. v. Reinert & Duree, P.C. (In re Just Brakes Corp. Systems, Inc.)*, 108 F.3d 881, 884 n.4 (8th Cir. 1997).

[46]    *See supra* note 34.

the Fourth Circuit in the *Better Homes* case,[47] on which the Third Circuit relied in the *Atlantic Business* case, held that a corporation may seek damages for a stay violation, reasoning that Congress was unlikely to grant a remedy only to individual debtors.  Therefore, the Court allowed corporate debtors to seek damages, rather than applying the plain meaning of the term "individual."[48]  The Second Circuit, in the *Chateaugay* case, criticized the Fourth Circuit's failure to apply the plain language by pointing out that the former §362(h) was added as part of the "Consumer Credit Amendments," which contained "numerous additions to the code relating only to 'individuals.'"[49]  The Ninth Circuit in the *Schwartz- Tallard* case[50] found valid justifications for limiting damages to natural persons.  "After all, the very class of plaintiffs authorized to sue – individual debtors in bankruptcy – by definition will typically not have the resources to hire private counsel.  And in many cases the actual damages suffered by the injured debtor will be too small to justify the expense of litigation, even if the debtor can afford to hire counsel."[51]  The issue in the *Atlantic Business* case was whether a trustee of the debtor could allege a violation of the automatic stay, when the debtor had been a "mere tenant at

---

[47]  *Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289 (4th Cir. 1986).

[48]  *Id.* at 292.

[49]  *Chateaugay*, 920 F.2d at 185-6.

[50]  *In re Schwartz-Tallard*, 803 F.3d 1095 (9th Cir. 2015).

[51]  *Id.* at 1100.

sufferance."[52]  The primary issue was the scope of the automatic stay, the trustee, not the

corporate debtor, sought damages.[53]  Therefore, the *dicta* is not controlling in this case.

## VI.   CONCLUSION

77.    For the foregoing reasons, Roma respectfully requests that the Court enter an

order, substantially in the form attached hereto, determining as a matter of law that the License

Agreement between Rupari and Roma cannot be assumed and assigned, and, issue an order in an

abundance of caution, retroactively modifying the automatic stay pursuant to 11 U.S.C. § 362(d)

in the event that the automatic stay could be held to apply to the License Agreement.

---

[52]    *Atlantic Business*, 901 F.2d at 327.

[53]    Several courts have analyzed whether a trustee for a debtor qualifies as an individual for purposes of §362(k).  *See, e.g.*, *Lassman v. Short (In re Foley)*, 2016 Bankr. LEXIS, at *24-29 (Bankr. D. Mass. Jan. 22, 2016).

Dated:  May 25, 2017

**DORSEY & WHITNEY (DELAWARE) LLP**

*/s/ Alessandra Glorioso*
Robert W. Mallard (DE Bar No. 4279)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  mallard.robert@dorsey.com
              glorioso.alessandra@dorsey.com

-and-

DORSEY & WHITNEY LLP

Bruce R. Ewing (*pro hac vice*)
Janet M. Weiss (*pro hac vice*)
Eric Lopez Schnabel (DE Bar No. 3672)
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  ewing.bruce@dorsey.com
              weiss.janet@dorsey.com
              schnabel.eric@dorsey.com

***Counsel to Roma Dining, LLC and
Romacorp., Inc.***