## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : | (Jointly Administered) |
| RUPARI HOLDING CORP., *et al.*,[1] | : |  |
|  | : | Case No. 17-10793 (KJC) |
|  | : | (D.I. 224) |
| Debtors | : |  |
|  | : |  |

## OPINION[2]

### BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Motion of Roma Dining, LLC and RomaCorp, Inc. (jointly, "Roma") for an order (i) finding as a matter of law that a trademark license agreement cannot be assumed and assigned, even if it had not been terminated pre-petition, and (ii) in an abundance of caution, retroactively modifying the automatic stay pursuant to 11 U.S.C. § 362(d) if the automatic stay could be held to apply to the License Agreement (D.I. 224) ("Roma's Motion"). Ruprecht Company filed a joinder to the Roma Motion (D.I. 233). The Debtors filed a response objecting to the relief requested in Roma's Motion (D.I. 330), which was joined by the Official Committee of Unsecured Creditors  (the "Committee") (D.I. 337).  For the reasons set forth herein, Roma's Motion will be granted.

---

[1] The Debtors in these chapter 11 cases are Rupari Holding Corp. and Rupari Food Services (the "Debtors" or "Rupari").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). This matter is a core proceeding pursuant to pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

BACKGROUND

The parties disagree on many facts surrounding this controversy, but Roma argues that this Court can decide the legal issue about the assignability of a trademark license agreement without resolving disputed factual issues. The Debtors argue, to the contrary, that no decision can be made without resolving the disputed facts. However, for the reasons set forth below, I conclude that in light of the undisputed facts, Roma is entitled to relief as a matter of law.

An understanding of a timeline of events in this matter is helpful. Most of the following facts are undisputed; any dispute regarding the particular facts are noted.

The License Agreement and Pre-petition Events

On May 1, 2007, Roma and the Debtors entered into a License Agreement in which Roma granted a trademark license to the Debtors that provided the Debtors with an exclusive license to utilize certain of Roma's licensed TONY ROMA'S marks (the "Licensed Marks") in connection with the manufacture, sale and distribution of certain refrigerated or frozen pork, beef and poultry products (the "Licensed Products"). The License Agreement was amended on November 3, 2010, June 14, 2011, and again on October 29, 2013.

Roma claims that the Debtors breached the License Agreement by failing to pay all royalties and other amounts owed under the agreement and by selling outside of the territory granted to the Debtors.[3] In January 2017, Roma sent two notices to the Debtors about the alleged defaults. On March 2, 2017, Roma sent written notice that the Debtors were in material breach of the License Agreement due to the Debtors' (i) failure to remit the past due royalty payments, and (ii) continued sale of Licensed Products to customers that were shipping Licensed Products outside of the Debtors' authorized territory, among other defaults. On March 27, 2017,

---

[3] The Debtors' territory to use the Licensed Marks was restricted to the United States, its territories and possessions, and U.S. military bases worldwide.

Roma sent written notice to the Debtors that Roma was terminating the License Agreement. The Debtors, however, dispute any breach of the License Agreement, arguing that Roma's claim for unpaid royalties are without merit and inconsistent with the parties' contractual obligations and course of dealings. The Debtors claim Roma had no grounds for terminating the License Agreement on March 27, 2017.

The Bankruptcy Filing

On April 10, 2017, the Debtors filed voluntary chapter 11 petitions for relief under the U.S. Bankruptcy Code. On the same day, the Debtors commenced an adversary proceeding against Roma (Adv. No. 17-50345) (the "First Adversary Proceeding") which, among other things, asked the Court to enter a declaratory judgment that Roma's attempted termination of the License Agreement was void.

On April 11, 2017, the Debtors filed a motion seeking authority to sell substantially all of their assets under sections 363 and 365 of the Bankruptcy Code (the "Sale") and for approval of bidding and sale procedures in connection with the Sale (the "Sale Motion"). (D.I. 27). Attached to the Sale Motion was a stalking horse agreement (the "Initial APA") between the Debtors and CBQ, LLC ("CBQ"). Assumption of the License Agreement was a closing condition of the Sale in the Initial APA. Roma filed an objection to the Sale Motion (D.I. 72), arguing that the License Agreement was terminated pre-petition and, even if it was not terminated pre-petition, Roma would not consent to assumption and assignment of the License Agreement.

Meanwhile, the Debtors filed a motion to expedite the First Adversary Proceeding, asking the Court to schedule an evidentiary hearing on the complaint within 60 days to obtain adjudication of their rights under the License Agreement, consistent with the asset sale timeline. (Adv. No. 17-50345 D.I. 4). Roma objected to the Debtors' motion to expedite the First

3

Adversary Proceeding, asking the Court to schedule an evidentiary hearing in 120 days, citing the need to respond to the Debtors' "extensive" discovery requests.[4] At an April 17, 2017 hearing to consider scheduling on the First Adversary Proceeding, the Court indicated it could schedule the trial on July 11, 12, or 13, 2017, setting the adversary proceeding on track for a hearing within 90 days of its filing.[5]

On April 26, 2017, the Debtors filed an omnibus response to the objections to the Sale Motion (D.I. 97), which included a revised version of the Initial APA (the "Revised APA") that removed assumption and assignment of the License Agreement as a closing condition and, instead, allowed for either a Sell Off Period (as defined in the Revised APA) for the Licensed Products or a purchase price reduction of $2 million. At the April 27, 2017 hearing on the Sale Motion, the Debtors assert that they indicated that they were not waiving any rights under the License Agreement and intended to work with Roma and other stakeholders to forge a consensual business solution. On April 27, 2017, the Court entered an order approving the bidding and sales procedures and approving CBQ as the Stalking Horse Purchaser (D.I. 100).

Then, on May 1, 2017, the Debtors filed a "Bankruptcy Rule 7041 Notice of Voluntary Dismissal" dismissing the First Adversary Proceeding *without prejudice*. (Adv. No. 17-50345 D.I. 20). On a previously scheduled telephonic conference on May 2, 2017, the Debtors confirmed the filing of the Rule 7041 Notice; Roma's counsel responded that Roma "needs to move on with its trademark and its business"[6] and would challenge any effort by the Debtors to revive the claims related to the License Agreement.

---

[4] Tr. 4/17/2017 (Adv. 17-50345 D.I. 13) at 12-13.
[5] *Id.* at 14.
[6] Tr. 5/2/2017 at 6:10-22.

On May 10, 2017, Roma issued a press release announcing a new exclusive licensing deal with Ruprecht Company ("Ruprecht").  On May 11, 2017, the Debtors sent a letter to Roma and Ruprecht demanding that Roma rescind the license agreement with Ruprecht and advising that Roma's and Ruprecht's actions violated the automatic stay.

On May 12, 2017, the Court entered a final order authorizing the use of cash collateral (D.I. 157), which gave the Debtors authority to use cash collateral through June 13, 2017.

On May 16, 2017, the Debtors commenced a second adversary proceeding against Roma and Ruprecht (Adv. No. 17-50482) (the "Second Adversary Proceeding") by filing a complaint seeking:  (1) a determination that Roma and Ruprecht willfully violated the automatic stay; and (2) a declaratory judgment that Roma's attempted termination of the License Agreement is void because Roma lacked a legal basis to terminate the License Agreement or because the agreement was not terminated in accordance with the required notice procedures.

On May 25, 2017, Roma filed this Motion.  On May 30, 2017, the Debtors filed a "Notice of Successful Bidder" (D.I. 230) announcing that the Stalking Horse Purchaser - - CBQ - - was the successful bidder for the purchase of substantially all of the Debtor's assets.  After a hearing on June 6, 2017, the Court entered an order approving the Sale to CBQ.  (D.I. 260).


DISCUSSION

1.    Whether the License Agreement may be assigned by the Debtors without Roma's consent?

The Debtors and Roma dispute whether Roma properly and justifiably terminated the License Agreement prior to the Debtors' bankruptcy filing.  However, Roma contends that I need not resolve this factual dispute prior to deciding the legal issue of whether the Debtors can assume and assign the License Agreement under Bankruptcy Code § 365(c)(1) without Roma's

consent. In other words, Roma argues that, even assuming for purposes of this Motion that the License Agreement was still effective on the date of the bankruptcy filing, the Debtors cannot assign the License Agreement without its consent and, therefore, Roma should be granted retroactive relief from the automatic stay under Bankruptcy Code § 362 to take control of the trademarks and relicense them to another party chosen by Roma.

Bankruptcy Code § 365(a) permits a trustee or debtor in possession to assume or reject any executory contracts of the debtor, subject to court approval.[7] "While the term 'executory contract' is not defined in the Bankruptcy Code, the Third Circuit has adopted the following definition: '[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'"[8]  In its Motion, Roma states that "[i]n the event this Court determines that the License Agreement has not been terminated, Roma does not dispute that the License Agreement would be an executory contract."[9]

A debtor may assign an executory contract if the debtor meets the requirements in § 365(f)(2), *i.e.,* if (A) the trustee assumes such contract or lease in accordance the provisions of this section [§ 365]; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." [10]

---

[7] 11 U.S.C. § 365(a), §1107(a).

[8] *In re Trump Entm't Resorts, Inc.,* 526 B.R. 116, 121 (Bankr. D. Del. 2015)(quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir. 1989) citing Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 MINN. L. REV. 439, 460 (1973)).

[9] Motion (D.I. 224) at 22 n. 10.

[10] 11 U.S.C. § 365(f)(2).

Bankruptcy Code §365(c)(1), however, provides that a debtor may *not* assume or assign any

executory contract if assignment is prohibited by applicable nonbankruptcy law.[11]

Federal trademark law provides that "a licensor who grants a non-exclusive license for

the use of its trademark is entitled to certain protections, including restrictions on assignment."[12]

In *Trump Entertainment*, the Bankruptcy Court recognized that the "substantial weight of

authority holds that under federal trademark law, trademark licenses are not assignable in the

absence of some express authorization from the licensor, such as a clause in the license

agreement itself,"[13] because:

> [t]he purpose of a trademark, after all, is to identify a good or service to the
> consumer, and identity implies consistency and a correlative duty to make
> sure that the good or service really is of consistent quality, i.e., really is the
> same good or service.[14]

"In other words, federal trademark law generally bans assignment of trademark licenses absent

the licensor's consent because, in order to ensure that all products bearing its trademark of

uniform quality, the identity of the licensee is crucially important to the licensor."[15]

---

[11] *Trump Entm't*, 526 B.R. at 122. Although Bankruptcy Code § 365(f)(1) grants a debtor the right to assign an executory contract regardless of a contract provision or applicable law prohibiting, restricting or conditioning assignment, § 365(f)(1) is expressly subject to Bankruptcy Code § 365(c). *Id.* (citing *Rieser v. The Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 698 (6th Cir. 1992) ("section 365(c), the recognized exception to 365(f), appears at first to resuscitate in full the very anti-assignment 'applicable law' which 365(f) nullifies"); and *In re ANC Rental Corp.*, 277 B.R. 226, 235 (Bankr. D. Del. 2002)).

[12] *Wellington Vision, Inc. v. Pearle Vision, Inc. (In re Wellington Vision, Inc.)*, 364 B.R. 129, 134 (S.D. Fla. 2007) (citing the Lanham Act, 15 U.S.C. § 1051 *et seq.*). *See also In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) (noting that the parties did not discuss whether applicable trademark law was state or federal, but deciding that it did not matter because "the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment.").

[13] *Trump Entm't*, 526 B.R. at 123 (citing *XMH*, 647 F.3d at 695; *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988, 992-93 (9th Cit. 2006); *N.C.P. Mktg. Group, Inc. v. Billy Blanks (In re N.C.P. Mktg. Group, Inc.)*, 337 B.R. 230, 235-37 (D. Nev. 2005); 3 *McCarthy on Trademarks* §18:43 (4th ed. 2010)).

[14] *Trump Entm't*, 526 B.R. at 124 (citing *XMH*, 647 F.3d at 695; 4 *McCarthy on Trademarks* § 25.33 (4th ed. 2010)).

[15] *Id.*

In *West Electronics*, (which did not involve trademark law, but dealt with a government military contract barred from assignment without consent under the Nonassignment Act, 41 U.S.C. § 15), the Court of Appeals for the Third Circuit reversed a bankruptcy court's denial of the government's request for relief from the automatic stay to terminate the military contract, holding:

> The bankruptcy court was . . . confronted with a situation in which the debtor in possession was not entitled to assume the contract without the government's consent and the government was unwilling to give that consent. In that situation, *the debtor in possession did not have a legally cognizable interest in the contract* and it was an abuse of discretion for the court to decline to lift the stay.[16]

Relying on *West Electronics* (and other cases), Roma argues that, without its consent to assignment, the Debtors have no legal interest in the License Agreement.[17]

However, "parties to a license agreement are free to contract around" the default rule that bars assignment of trademark license agreements without consent.[18] The Debtors distinguish *West Electronics* (and other cases) by pointing out that the First Amendment to the License Agreement removed the anti-assignment clause in the original License Agreement and replaced it with a provision expressly allowing assignment, which states:

> This Agreement may be assigned by either party to its successors or assigns by operation of law or pursuant to a sale of all or substantially all of its assets only with the consent of the other party, which consent shall not be unreasonably withheld or delayed.[19]

---

[16] *Matter of West Elec., Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (emphasis added).

[17] *See, e.g., Trump Entm't*, 526 B.R. at 127 (granting licensor relief from the stay to proceed with a state court action to terminate the trademark license after holding that the trademark license agreement was not assignable under applicable non-bankruptcy law and, thus, was not assumable or assignable under Section 365(c)(1)).

[18] *Trump Entm't*, 526 B.R. at 124.

[19] First Amendment, § 3.10 (the "Assignment Provision").

8

The Debtors contend that this Assignment Provision removes it from the assignment exception of Bankruptcy Code § 365(c)(1) and allows assignment of the License Agreement. In response, Roma relies upon *Wellington Vison*, which decided that "a clause against unreasonable withholding of consent is not the equivalent of a clause expressly allowing assignment without consent."[20] The *Wellington Vision* court decided, and I agree, that the consent to assignment provision does not vitiate application of the § 365(c)(1) barrier to assignment.[21]

But the Debtors further argue that Roma did not comply with the Assignment Provision because it unreasonably withheld consent by flatly refusing to consider the "well qualified, prospective bidders" identified during the Debtors' sale process.[22] The Debtors argue that *Wellington Vision* is not analogous because the *Wellington Vision* court was not asked to consider whether the non-debtor acted reasonably.

Roma claims that it has acted reasonably, but also points out that the Assignment Provision in the License Agreement is limited and a party can be asked to consent to assignment only if the assignment is (i) by operation of law, or (ii) pursuant to a sale of all or substantially all of the Debtors' assets. Roma argues that the undisputed facts show that neither situation can now be applicable here because the Debtors have already concluded the sale of substantially all of their assets without an assignment of the License Agreement. The undisputed fact that the Debtors already closed on the sale of substantially all of their assets makes the reasonableness issue moot.

The Debtors respond to Roma's argument by claiming that the prevention doctrine in contract law applies here and bars Roma from arguing that an assignment must be made in

---

[20] *Wellington,* 364 B.R. at 136.
[21] *Id.*
[22] *See* Debtors Response (D.I. 330) at 20-21.

9

connection with a sale of substantially all of the Debtors' assets. "The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused."[23] The Debtors argue that Roma's conduct - - prior to the bankruptcy filing and during the bankruptcy case - - was designed to thwart the Debtors' attempts to transfer the License Agreement as part of a sale of substantially all of the Debtors' assets. The Debtors claim that the requirement to assign the License Agreement in connection with a sale of substantially all of the Debtors' assets should be waived.

However, the Assignment Provision is clear. The License Agreement may only be assigned by operation of law or as part of a sale of substantially all of the Debtors' assets.[24] The Debtors decided to revise the Initial APA and move forward with the asset sale without resolving its claims against Roma. The Debtors have completed a sale of substantially all of their assets and it would now be impossible for an assignment to occur under either condition set forth in the Assignment Provision. Whether the Debtors have claims against Roma based on its conduct in connection with its efforts to terminate the License Agreement is an issue for another proceeding. What is clear today, however, is that there can be no proposed assignment of the License Agreement under the Assignment Provision that the Debtors can present to Roma for its consent. Pursuant to Bankruptcy Code § 365(c)(1) and the language of the Assignment Provision, the Debtors cannot assign the License Agreement.

---

[23] *WaveDivision Holding, LLC v. Millennium Digital Media Sys., L.L.C.,* C.A. No. 2993-VCS, 2010 WL 3706624, \*14 n. 110 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 245; *Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717, 725 (4th Cir. 2000)).

[24] A discussion about the type of mergers or other transactions that may be assignments "by operation of law" under Delaware law can be found in *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH,* 62 A.3d 62 (Del. Ch. 2013).

2.    Whether the automatic stay should be modified retroactively, if applicable, to allow Roma to repossess the license agreement?

Roma argues that it terminated the License Agreement prior to the bankruptcy filing and, therefore, the stay of Bankruptcy Code § 362(a) is not applicable. However, "in an abundance of caution" Roma requests that this Court retroactively lift the automatic stay "to prevent the Debtors' continued interference [with the License Agreement] and damage to Roma's business."[25]   The Debtors do not directly address Roma's request for relief from stay in their responsive brief or sur-reply, but argue that Roma's actions have been unjust and inequitable.

Bankruptcy Code § 362(d) provides that, upon request of a party in interest and after notice and a hearing, a court shall grant relief from the stay - - including by annulling the stay -- for cause.[26]   The Court of Appeals for the Third Circuit, as well as other circuit courts, "have held that action in violation of the stay, although void, may nevertheless be reinvigorated through a retroactive annulment of the stay."[27]

In many instances, courts considering a request for retroactive relief from the automatic stay will consider whether the bankruptcy petition was filed in bad faith.[28]   There is neither evidence -- nor any allegation - - that the Debtors filed their chapter 11 petition in bad faith.

---

[25] Roma Motion (D.I. 224), ¶ 62.

[26] 11 U.S.C. § 362(d) provides:
On the request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay - -

    (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest;

    (2)    with respect to a stay of an act against property under subsection (a) of this section, if - -

        (A)    the debtor does not have an equity in such property; and

        (B)    such property is not necessary to an effective reorganization.

[27] *In re Myers,* 491 F.3d 120, 127 (3d Cir. 2007) (citing *In re Silciliano,* 13 F.3d 748, 750 (3d Cir. 1994); *Mataya v. Kissinger (In re Kissinger),* 72 F.3d 107, 109 (9th Cir. 1995)).

[28] *Myers,* 491 F.3d at 128 (citing, *e.g., Kissinger,* 72 F.3d at 109; *In re Albany Partners,* 749 F.2d 670, 674-75 (11th Cir. 1984)).

Other courts deciding whether to annul the stay also have considered factors such as (1) whether the creditor was aware of the filing or encouraged violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior and (3) whether the creditor would be prejudiced.[29]

"Whether to annul the automatic stay is a decision committed to the bankruptcy court's discretion."[30]  In *Myers,* the Third Circuit noted that some courts have observed that retroactive relief is appropriate only in "extreme circumstances," while others "have purported to give the court 'wide latitude' to 'balance[] the equities' on a case by case basis."[31]  The Third Circuit concluded, however, that "[e]ven those cases that have subscribed to a narrow conception of the power to retroactively annul the stay have affirmed that balancing the equities is the appropriate test."[32]  Moreover, seeking relief from the stay under § 362(d)(1) for "cause" is a "flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."[33]

I have already decided that the Debtors cannot assign the License Agreement without the consent of Roma.  Consistent with *Trump Entertainment*, this provides "cause" for relief from the automatic stay.[34]

However, a further weighing of the equities of this matter is required to determine whether Roma is entitled to retroactive relief from the stay and, if so, the date on which such

---

[29] *Id.* (citing 11 U.S.C. § 362; *In re Brown,* 311 B.R. 409, 412 (E.D. Pa. 2004)).

[30] *Id.*

[31] *Id.* at 129 (comparing *Phoenix Bond & Indem. Co v. Shamblin (In re Shamblin),* 890 F.2d 123, 126 (9th Cir. 1989) with *Nat'l Envtl. Waste Corp. v. City of Riverside (In re Nat'l Envtl. Waste Corp.),* 129 F.3d 1052, 1054-55 (9th Cir. 1997)).

[32] *Id.*

[33] *Trump Entm't,* 526 B.R. at 120 (quoting *In re The SCO Group, Inc.,* 395 B.R. 852, 856 (Bankr. D. Del. 2007)).

[34] *Trump Entm't,* 526 B.R. at 127.

relief should be granted.  Here, Roma knew about the bankruptcy filing, but from the start Roma took the position that the License Agreement was terminated prepetition and was not part of the Debtors' estates.  The Debtors, however, contested Roma's position and sought to litigate the issues surrounding Roma's asserted prepetition termination of the License Agreement in the First Adversary Proceeding.  The Debtors also intended to assume and assign the License Agreement as part of the asset sale.  Roma knew the Debtors' position and objected to assumption and assignment of the License Agreement with the Sale.

However, at the hearing to consider bidding procedures in the Sale Motion, the Debtors announced that the Revised APA removed assumption and assignment of the License Agreement as a condition of sale.  Thereafter, the Debtors filed a notice of dismissal for the First Adversary Proceeding.  At a telephone conference regarding dismissal of the First Adversary Proceeding, Roma asked for clarification about the dismissal "without prejudice," noting that an attempt to revive the claims would cause "serious complications" not just in connection with the asset sale, but also for Roma "which needs to move on with its trademark and its business."[35]

Upon review of the totality of the circumstances and weighing the equities in this case, I conclude that as of May 2, 2017, it was clear to both parties that the License Agreement was not being assigned as part of the sale of substantially all of the Debtors' assets.  At that point in time, the uncertainty and prejudice to Roma arising from the continued application of the automatic stay to the trademarks weigh in favor of annulling the automatic stay as of that date.

---

[35] Tr. 5/2/2017 (Adv. No. 17-50345 D.I. 24) at 5.

CONCLUSION

For the reasons set forth above, Roma's Motion will be granted because (i) Bankruptcy Code § 365(c)(1) and the Assignment Provision in the License Agreement bar the Debtors from assigning the License Agreement, and (ii) the stay of Bankruptcy Code § 362(a), to the extent it applies to Roma, is annulled for cause, retroactive to May 2, 2017.

An appropriate order will follow.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

Dated:  August 18, 2017