## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* : | Chapter 11 |
| **RUPARI HOLDING CORP.,** *et al.,*[1] : | |
| : | Case No. 17-10793 (KJC) |
| Debtors. : | |
| : | (Jointly Administered) |
| _____: | D.I. 293 |

### OPINION[2]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Debtors' Omnibus Motion for Entry of An Order Authorizing the Rejection of Certain Executory Employment Contracts *Nunc Pro Tunc* to the Closing Date (D.I. 293) (the "Rejection Motion"), which seeks authorization to reject thirty contracts (collectively, the "Rejection Contracts"). Two of the Debtors' former employees, Andrea Baker and Hector Herrera (collectively, the "Objecting Employees"), jointly represented, filed the Response of Andrea Baker and Hector Herrera to Debtors' Motion to Reject Employment Agreements (D.I. 314) (the "Objection"). On July 24, 2017, the Court held a hearing to address the issue of whether certain contracts between the Objecting Employees and the Debtors (the "Separation Agreements") are executory contracts subject to rejection. After conducting oral argument, I asked the parties to make supplemental submissions in support of their respective positions (the "Supplemental Submissions").[3] Subsequently, I took this matter under advisement.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Rupari Holding Corp. (4943) and Rupari Food Services, Inc. (7933). The mailing address for the Debtors is 15600 Wentworth Avenue, South Holland, Illinois 60473.

[2] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and §§ 157(b)(2)(A) and (O).

[3] *See* D.I. 433 & D.I. 435. I posed the following clarifying questions to the parties for response in the Supplemental Submissions: (1) Is it necessary for the Court to determine whether the Separation

For the reasons that follow, I find that the Separation Agreements are executory contracts and will enter an order authorizing rejection of all thirty Rejection Contracts, including the Separation Agreements, *nunc pro tunc* to the Closing Date, as the Debtors have requested.[4]

## BACKGROUND

Ms. Baker, age 65, and Mr. Herrera, age 69, are former employees of the Debtor. Together, they claimed to have been unlawfully replaced by younger employees. The Debtors entered into: (i) the Confidential Separation and Release Agreement, executed on March 3, 2017 with Andrea Baker (the "Baker Separation Agreement"); and (ii) the Confidential Separation and Release Agreement, executed on April 6, 2017 with Hector Herrera (the "Herrera Separation Agreement") (collectively, the "Separation Agreements"). The Separation Agreements, among other things, bound the Objecting Employees to: (i) a non-compete clause for a term of 6-months after their respective separation dates; (ii) a non-solicitation clause for a term of 12-months after their respective separation dates; (iii) a confidentiality clause; and (iv) a release of all claims against the Debtors arising out of their employment or termination (the "General Release Obligations").

In consideration for signing the Separation Agreements, the Debtors agreed to pay the Objecting Employees for all hours worked and for accrued but unused vacation through their respective separation dates (the "Vacation Payments"), plus additional consideration, to be paid in

---

Agreements are executory contracts for it to determine the status of the claims asserted by the Objecting Employees?; (2) Does the state of Illinois consider a breach of non-compete and non-solicitation provisions of employment contracts material defaults?; and (3) On what date(s) were the severance payments(s) and vacation time "earned" for purposes of determining whether the underlying claims (or any part thereof) are of administrative priority? The Supplemental Submissions reflected divergent views on these questions. Because of that and because the Rejection Motion did not request any determination with respect to the classification of any claim arising from rejection of the Separation Agreements, this Opinion does not address the issue of classification.

[4] The request for *nunc pro tunc* treatment is unopposed.

installments commencing after the Objecting Employees executed the Separation Agreements (the "Additional Consideration").

Under the Baker Separation Agreement, Ms. Baker's employment was deemed terminated as of April 17, 2017. Under the Herrera Separation Agreement, Mr. Herrera's employment was deemed terminated as of May 26, 2017 (collectively, the "Separation Dates").

On April 10, 2017 (the "Petition Date"), each Debtor filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their properties and assets as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code. On April 11, 2017, the Debtors filed a motion seeking authority to sell substantially all of their assets under Sections 363 and 365 of the Bankruptcy Code and approval of bidding and sale procedures in connection with the Sale.[5] On April 27, 2017, I entered an order approving bidding and sale procedures and approving CBQ, LLC as the "Stalking Horse Purchaser."[6] On May 30, 2017, the Debtors filed a Notice of Successful Bidder, announcing that the Stalking Horse Purchaser was the successful bidder for the purchase of substantially all of the Debtors' assets. The Stalking Horse Purchaser did not assume the Separation Agreements as part of its Asset Purchase Agreement.

On June 7, 2017, I entered an order approving the sale.[7] The sale closed on June 14, 2017 (the "Closing Date"), and the Debtors are now in the process of winding down their estates. Accordingly, the Debtors have ceased operations, no longer have any employees, and consequently argue that they have neither the need nor the funds to continue to abide by the Separation Agreements.[8]

---

[5] See D.I. 27.
[6] See D.I. 100.
[7] See D.I. 260.
[8] See D.I. 293, at 3.

## DISCUSSION

The Debtors argue that the Separation Agreements are prepetition executory contracts subject to assumption or rejection under 11 U.S.C. § 365. Accordingly, the Debtors assert that rejection of the Separation Agreements is reasonable under the business judgment rule.

In response, the Objecting Employees assert that the Separation Agreements are not executory contracts because they were "virtually fully performed" and, thus, not subject to assumption or rejection under 11 U.S.C § 365.

### 1. The Separation Agreements are Executory Contracts.

Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[9] While the Bankruptcy Code does not provide a concrete definition of "executory contract," it is well settled in the Third Circuit that "[an executory contract is] a contract under which the obligation[s] of both the bankrupt and other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[10] If both parties to a contract have unperformed material obligations, the contract is executory and is capable of being rejected or assumed under section 365 of the Bankruptcy Code.[11] As a further qualification, such bilateral material unperformed obligations must exist at the time the bankruptcy

---

[9] 11 U.S.C. § 365(a).
[10] *In re Columbia Gas Sys., Inc.*, 146 B.R. 106, 111 (D. Del. 1992) (quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 (1973)).
[11] *See In re Exide Techs.*, 378 B.R. 762, 766 (Bankr. D. Del. 2002) (citing *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995)).

petition is filed.[12] Accordingly, the primary issue at bar is whether there were bilateral material unperformed obligations under the Separation Agreements on the Petition Date.[13]

The Debtors maintain that, as of the Petition Date, both the Objecting Employees and the Debtors had materially unperformed obligations under the Separation Agreements. Specifically, the Debtors point out their obligations to make Additional Consideration and Vacation Payments on the one hand, and on the other hand point out the Objecting Employees' obligations to continue working for the Debtors until the Separation Dates and to adhere to the non-compete and non-solicitation requirements under the Separation Agreements.[14] The Debtors acknowledge, however, that the General Release Obligations were fully performed upon the execution of the Separation Agreements, prior to the Petition Date.

The Objecting Employees argue in response that the Separation Agreements did not contain bilateral material unperformed obligations on the Petition Date because the Separation Agreements were "virtually fully-performed because the Debtor ha[d] already derived the value that it wanted from the agreements—the release by Ms. Baker and Mr. Herrera of their claims against the Debtor for age discrimination and other legal claims based upon their wrongful terminations."[15] Accordingly, because the General Release Obligations were fully performed upon

---

[12] *See In re Exide Techs.*, 378 B.R. at 766 (quoting *In re Columbia Gas Sys. Inc.*, 50 F.3d at 240 ("The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed."); *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 510. (Bankr. D. Del. 2003).

[13] *See In re Columbia Gas Sys., Inc.*, 50 F.3d at 239; *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002); *In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 43 (Bankr. D. Del. 1999).

[14] Under the Separation Agreements, the Objecting Employees were to be paid, for all hours worked, through the Separation Dates, regardless of whether the Objecting Employees signed the Separation Agreements. It follows that the obligations to continue working up to the Separation Date will not be considered as material unperformed obligations for purposes of this analysis. *See* Confidential Separation and Release Agreement, at ¶ 1.

[15] D.I. 314 at 2.

the signing of the Separation Agreements, the Objecting Employees conclude that there were no

bilateral material unperformed obligations on the Petition Date.

Aside from competing statements in the papers, the record provides scant evidence to

support the Objecting Employees' assertion that the primary value of the Separation Agreements

is the General Release Obligations.[16] However, determining the subjective intent of the Debtors in

entering into these agreements is unnecessary. If the Objecting Employees' obligations to adhere

to the non-compete and non-solicitation clauses are material to the Separation Agreements, the

contention regarding the General Release Obligations necessarily fails.

Accordingly, under Illinois law,[17] the determination of whether a breach is material:

> is a complicated question of fact involving an inquiry into such matters as whether
> the breach worked to defeat the bargained-for objective of the parties or caused
> disproportionate prejudice to the non-breaching party, whether custom and usage
> considers such a breach to be material, and whether the allowance of reciprocal
> non-performance by the non-breaching party will result in his accrual of an
> unreasonable or unfair advantage.[18]

In the present case, this inquiry can be broken down into three separate questions: (1) what was

the bargained-for objective of the parties to the Separation Agreements; (2) under Illinois law, is

---

[16] *See, e.g.*, D.I. 433, at 3 ("[T]he purpose of the Separation Agreements was to terminate Ms. Baker and Mr. Herrera and insulate the Debtor from liability claims."); *see contra* D.I. 435, at 8 ("Mr. Herrera and Ms. Baker had outstanding obligations including the Non-Compete Covenant and Non-Solicit Covenant... This was a central purpose of the Prepetition Separation Agreements.").

[17] I will interpret the Separation Agreements in accordance with Illinois law, as the parties have agreed that the laws of the State of Illinois will control the Separation Agreements. *See* Confidential Separation and Release Agreement, at ¶ 15 (Controlling Law).

[18] *William Blair & Co. v. FI. Liquidation Corp.*, 358 Ill. App. 3d 324, 346–47 (2005) (quoting *Sahadi v. Cont'l Illinois Nat. Bank & Tr. Co. of Chi.*, 706 F.2d 193, 196 (7th Cir. 1983); *see also InsureOne Independent Ins. Agency, Inc. v. Hallberg*, 976 N.E.2d 1014, 1027 (Ill. App. Ct. 2012) ("The breach must be so material and important to justify the injured party in regarding the whole transaction at an end."); *Id.* (quoting *Vill. of Fox Lake v. Aetna Cas. & Sur. Co.*, 534 N.E.2d 133, 141 (Ill. App. 3d 1989) ("The test of whether a breach is 'material' is whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement.")); *see contra Circle Sec. Agency, Inc. v. Ross*, 107 Ill. App. 3d 195, 202 (1982) ("A minor breach is compensable in damages but will not generally give rise to a cause of action on the entire contract, nor excuse the nonbreaching party's duty of counterperformance.").

the breach of non-compete and non-solicitation clauses generally considered material in the overall context of employment agreements; and (3) would the Objecting Employees' breach of the non-compete or non-solicitation clauses disproportionately benefit the Debtors by negating their obligation to pay the Additional Consideration and Vacation Payments?

Under the tenants of contract interpretation, the starting point for determining the bargained-for objective of the parties is the four-corners of the Separation Agreements.[19] As pointed out by the Debtors, the Separation Agreements in question provide at paragraph 15, "[B]reach of any obligation or covenant set forth in this Agreement will have a material and adverse effect upon the Company and will cause the Company irreparable harm, and damages arising from any breach may be difficult to ascertain."[20] The Debtors argue that because "[s]imilar language does not appear elsewhere in the Prepetition Separation Agreements... [it] is indicative of the import and materiality of the Restrictive Covenants."[21] However, paragraph 15, titled "Injunctive Relief," by its very language applies to all obligations and covenants within the Separation Agreements, not just the non-compete and non-solicitation clauses.

Moving on to the second question, the parties clash as to whether Illinois considers these types of restrictive covenants, and the breach thereof, material. While the Debtors argue briefly

---

[19] See Salce v. Saracco, 949 N.E.2d 284, 288 (Ill. App. Ct. 2011) ("The primary goal of contract interpretation is to give effect to the intent of the parties... If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract itself, which should be given its plain and ordinary meaning, and then the contract should be enforced as written."); see also William Blair & Co., LLC v. FI Liquidation Corp., 830 N.E.2d 760, 775 (Ill. App. Ct. 2005) (citing Bankier v. First Federal Savings & Loan Ass'n of Champaign, 225 Ill. App. 3d 864, 869, 588 N.E.2d 391, 394 (1992) ("Although it is a primary goal of contract construction to give effect to the intentions of the parties at the time the contract was executed, that intention is to be determined objectively by examining the language the parties agreed upon rather than by any subjective explanation given in hindsight.")); In re Columba Gas Sys., Inc., 50 F.3d 233, 241 (3d Cir. 1995) (quoting Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 455–56 (7th Cir.) cert. denied, 502 U.S. 939 (1991) ("Interpreting a settlement agreement presents a question of contract law, in which [t]he primary object... is to give effect to the intention of the parties.")).

[20] Confidential Separation and Release Agreement, at ¶ 15.

[21] D.I. 435, at 10.

that the non-compete and non-solicitation clauses are central provisions, and thus material, to the Separation Agreements, the Objecting Employees support their contention by citing to *In re Enrique M. Lopez, M.D.S.C.*[22] This citation, perhaps not in the way the Objecting Employees intended, is instructive for two reasons.

First, it is correct that the *Lopez* Court held that Dr. Bruni's breach of the non-compete clause contained in the Asset Purchase Agreement in question did not amount to a material breach of the agreement.[23] In reaching this decision, however, the Court had the benefit of hindsight.[24] The Court was able to examine the consequences of the party's breach and determine whether the Debtor was "deprived to any significant degree of the benefit the Debtor expected to derive from the Agreement."[25] Accordingly, as a result of the breach, the Court found that the Debtor "suffered, at most, minimal harm."[26] Contrasted with the case at hand, the Court here can look only prospectively at the hypothetical consequences that would arise should the Objecting Employees breach one or both of the restrictive covenants.[27]

Second, the Court in *Lopez* distinguished between whether a *clause* is material and whether the *breach* is material.[28] Specifically, the Court noted, "There is no doubt, as the Debtor contends, that the covenant not to compete is a *material provision* of the Agreement."[29] This is a clear indication that, even in the context of an asset purchase agreement, much larger in scope than

---

[22] 93 B.R. 155 (Bankr. N.D. Ill. 1988).
[23] *Id.*
[24] The party in question breached the non-compete clause of the agreement prior to the Debtors' bankruptcy filing, and accordingly, before the matter was brought before the bankruptcy court.
[25] *In re Lopez*, 93 B.R. at 160.
[26] *Id.*
[27] As noted *supra*, the only evidence of speculative future harm is the Debtors' citation to the language of the Separation Agreements indicating that any breach would cause "irreparable harm."
[28] *In re Lopez*, 93 B.R. at 160.
[29] *Id.* (emphasis added).

the Separation Agreements in question here, restrictive covenants such as non-compete clauses are generally considered material under Illinois law.

As to the third question, nothing in the record indicates that, upon a breach of the non-compete or non-solicitation clauses, the Objecting Employees would suffer a disproportionate harm or that the Debtors would disproportionately benefit if the Debtors were then able, reciprocally, to discontinue their obligations under the Separation Agreements.

Taking into account the language of the Separation Agreements, indicating that the parties intended to convey materiality to each restrictive covenant, the custom and usage of restrictive covenants under Illinois law, as directed through *Lopez,* and the absence of evidence on the record indicating a disparity in advantages upon a hypothetical breach, I find that the Objecting Employees obligations under the non-compete and non-solicitation clauses of the Separation Agreements were material; the parties to the Separation Agreements each had material unperformed obligations upon the Petition Date. Thus, the Separation Agreements are executory contracts subject to rejection or assumption under 11 U.S.C. § 365.

### 2. The Debtors May Reject the Separation Agreements Under Section 365(a) of the Bankruptcy Code.

The business judgment rule governs a debtor's decision of whether to reject an executory contract under 11 U.S.C. § 365.[30] "Under the business judgment standard, the sole issue is whether

---

[30] *See, e.g., In re HQ Global Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003) (citing *Grp. of Institutional Inv'rs v. Chicago, M., St. P. & P. R. Co.,* 318 U.S. 523 (1943)); *Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.),* 293 B.R. 124, 126 (D. Del. 2003).

the rejection benefits the estate."[31]   Further, a "debtor's determination to reject an executory contract can only be overturned if the decision was the product of bad faith, whim or caprice."[32]

Here, the Stalking Horse Purchaser elected not to assume the Separation Agreements. Given the sale of substantially all of their assets, the cessation of operations, and the focus on winding down their estates, the record is clear that the Separation Agreements no longer provide any benefit to the Debtors or their estates.[33] Accordingly, the Debtors have determined that rejecting the Separation Agreements is in the best interests of their estates and creditors. There is nothing in the record to suggest that the decision was not made in the sound exercise of the Debtors' reasonable business judgment. Therefore, I will authorize the Debtors to reject the Separation Agreements under 11 U.S.C. § 365.

### 3. The Court Will Authorize the Rejection of the Rejection Contracts Effective *Nunc Pro Tunc* to the Closing Date.

The Debtors also seek an effective rejection date for the Rejection Contracts, including the Separation Agreements, *nunc pro tunc* to the Closing Date. Section 365 of the Bankruptcy Code does not specifically address whether courts may order rejection to be effective retroactively.[34] However, courts have held that bankruptcy courts may exercise their equitable powers in granting

---

[31] *In re HQ Global Holdings, Inc.*, 290 B.R. at 511; *see also N.L.R.B. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) *aff'd sub nom.*, 465 U.S. 513 (1984) (stating that the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate."); *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3d Cir. 1992) (citing *Data-Link Sys. Inc. v. Whitcomb & Keller Mortg. Co. (In re Whitcomb & Keller Mortg. Co., Inc.)*, 715 F.2d 375. 379 (7th Cir. 1983)) (explaining that section 365 is "designed to allow[] the trustee or debtor in possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization.").

[32] *In re HQ Global Holdings, Inc.*, 290 B.R. at 511 (citing *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001)).

[33] The Objecting Employees do not dispute that the decision to reject the Separation Agreements, if determined executory, falls within the Debtors' business judgment.

[34] *See* 11 U.S.C. § 365.

such a retroactive order when doing so promotes the purposes of Section 365(a).[35]  Courts have

further held that the retroactive rejection of executory contracts and unexpired leases may be

approved "after balancing the equities" of a case and concluding that such equities weigh in favor

of the debtor.[36]

Interestingly, although case law regarding retroactive rejection in the context of

commercial real estate is plentiful, this issue in the context of employment agreements is fairly

unexplored. The Ninth Circuit's decision in *In re At Home Corp.*[37] provides a brief history of this

issue, illustrating the evolution of retroactive nonresidential lease rejections since the First

Circuit's 1995 decision in *In re Thinking Machines, Corp.*[38] The Court also explained that "the

equitable authority recognized in *Thinking Machines* has been imported to contexts other than

unexpired nonresidential leases,"[39] pointing to *In re Malden Mills Indus., Inc.*'s application of this

principle to the abandonment of personal property.[40]

The Debtors in the present case contend that retroactive rejection is appropriate for four

reasons: (1) following the sale, the Debtors effectively ceased operations and no longer had a need

for employee services, which was communicated to the employees prior to the closing; (2) the

---

[35] *See, e.g., In re Thinking Machines Corp.*, 67 F.3d 1021, 1028–29 (1st Cir. 1995) (holding that "rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively" to the motion filing date); *see also Pacific Shore Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1067 (9th Cir. 2004) (holding "that a bankruptcy court, in exercising its equitable powers under 11 U.S.C. § 105(a), may approve the retroactive rejection of a nonresidential lease when 'necessary or appropriate to carry out the provisions of' § 365(d)."); *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004); *TW, Inc. v. Angelastro (In re TW, Inc.)*, Case No. 03-10785 (MFW), 2004 WL 115521, at *2 (D. Del. Jan. 14, 2004) (holding that bankruptcy courts may approve rejection of a nonresidential lease retroactive to the motion filing date "when principles of equity so dictate."); *In re Fleming Cos., Inc.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003).

[36] *See In re Chi-Chi's, Inc.*, 305 B.R. at 399.

[37] 292 F.3d 1064, 1069–70 (9th Cir. 2004).

[38] 67 F.3d 1021 (1st Cir. 1995).

[39] *In re At Home Corp.*, 292 F.3d at 1070.

[40] *See* 303 B.R. 688, 701 (B.A.P. 1st Cir. 2004).

Debtors do not have the funds to make payments under the Rejection Contracts and remittance would not benefit the estate; (3) the payment provisions of the Rejection Contracts create further burdens on the estate; and (4) the Rejection Contracts contain non-compete clauses, which place burdens on the counterparties.[41] Accordingly, the Debtors assert that neither the Debtors nor the counterparties to the Rejection Contracts will suffer prejudice as a result of the retroactive rejection.[42]

The Objecting Employees have not contested such retroactive rejection either in the Objection or in the Supplemental Submission. Therefore, upon a review of the principles of equity under the circumstances,[43] the Court will authorize the rejection of the Rejection Contracts, including the Separation Agreements, *nunc pro tunc* to the Closing Date.

[*Space intentionally left blank*]

---

[41] D.I. 293, at 7.

[42] *Id.*

[43] *See In re At Home Corp.*, 392 F.3d at 1075 ("We… eschew any attempt to limit the factors a bankruptcy court may consider when balancing the equities in a particular case. We need not… decide whether any one of the factors on which the bankruptcy court relied, standing alone, would justify an exercise of discretion. But in combination those factors support[] the court's equitable decision.").

**CONCLUSION**

The Separation Agreements are executory contracts, and I will enter an order authorizing rejection of all thirty Rejection Contracts, including the Separation Agreements, under 11 U.S.C. § 365, *nunc pro tunc* to the Closing Date. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  November 26, 2017

13